## LIMBECK v. INTERSTATE POWER CO.

### No. 9473.

Circuit Court of Appeals, Eighth Circuit.

Feb. 20, 1934.

L. F. Tierney, of Dubuque, Iowa (H. C. Kenline, R. P. Roedell, H. J. Hoffmann, and Kenline, Roedell, Hoffmann & Tierney, all of Dubuque, Iowa, on the brief), for appellant.

W. A. Smith, of Dubuque, Iowa (F. A. O'Connor and Smith & O'Connor, all of Dubuque, Iowa, on the brief), for appellee.

Before STONE, VAN VALKENBURGH, and BOOTH, Circuit Judges.

STONE, Circuit Judge.

This is an action for damages on account of burning a large barn claimed to have been caused by negligence of the power company in operating and maintaining transmission lines and equipment furnishing electric current to plaintiff's premises, including this barn. From a judgment entered on verdict directed

for defendant at the close of all of the testimony, plaintiff brings this appeal. The points presented here have to do with the sufficiency of the evidence to carry the case to the jury and with rulings on evidence.

## I.

### Sufficiency of Evidence.

While there was decided conflict in the evidence on most of the vital points in the case, we are required to test the sufficiency of the evidence from the standpoint solely of the testimony most favorable to the plaintiff. So considered, the following appears: Plaintiff had a farm plant consisting of residence, the barn burned, a bull barn, and a pump house. The barn was a large, valuable structure with extensive facilities for cattle, a large loft room and an incubator room. West of the barn a short distance was a smaller structure known as the bull barn and north of that was a pump house containing an air compressor operated by an electric motor. All of these buildings were on the south side of a public highway. On the northern side of the highway the company maintained a high tension line. This consisted of two distinct circuits. The circuit near the top of the wires consisted of three wires carrying 33,000 volts. About four feet below and on the same poles were the three wires of another circuit carrying 2,300 volts. For the purpose of furnishing current from the lower of the above transmission lines to plaintiff's buildings, defendant installed transformers and erected service lines running onto plaintiff's property. The lighting systems in the barns were wired for 110 volts while the electric motor operating the compressor pump in the pump house required 220 volts. To meet this difference in voltage defendant installed two transformers on one of its poles, the one on the south to reduce the 2,300 volts of the transmission line to 110 volts for the barns, and the one on the north to reduce the voltage to 220 volts for the motor. From the south transformer, wires passed to the large barn (which was burned) where they connected with the light wiring system of that barn near the north gable of the roof well up under the eaves. From the light system wiring of this barn, two wires passed through a west dormer window to the bull barn where they were connected with the light system wiring therein. From the north transformer, wires led direct to the pump house for operation of the motor. As this motor was three phase, one of the leads of the north transformer was connected to one of the secondary lines of the south transformer and the other secondary line of the south transformer led to the pump motor. In the bull barn there were fuses which would blow out if excessive current should come to them. The wires in both barns were covered with approved insulation made up of rubber and other materials.

The day of the occurrence was rainy and stormy. There were no lights being used at the time in the bull barn and, apparently, the pump was not being operated. Two employees of the plaintiff were working in the barn with the lights on until about noon. They left for dinner at that time leaving no lights on and everything, apparently, all right. An incubator in the barn was not in operation and had not been for more than a day. At that time there were neither fire, lights, nor use of current of any kind in either of the barns. About thirty minutes later a school boy coming along the highway saw the barn was on fire and at once informed the employees, who were in the house a few hundred yards away. When these employees ran out, they observed small flames and smoke coming from both ends of the barn up near the peak of the gable, both where the power wires entered the barn and at the opposite end. They rushed into the barn to save the cattle which were there and noticed a volume of black smoke smelling like tar or rubber. One of them went up to the loft and saw fire underneath the roof along the electric wires attached to the roof rafters. All the employees were able to do was to save the cattle and the barn burned. After the fire, it was discovered that the fuses in the fuse box at the bull barn were not only blown out but that the brass heads and mica tops had been blown off and it was necessary to use pliers to get the fuses out. After the fire, the pump motor would not work and, thinking that it might be burned out, it was sent for inspection and repair to an employee of the defendant who found that it was not damaged. It was again installed but would not work. Also, the lights in the bull barn would not work although other wires had been stretched direct from the south transformer to that barn after the fire. After the company had installed a new north transformer, both the pump motor and the bull barn lights operated.

The transformer which was replaced was found to be defective. A transformer is a piece of electric equipment whose function is to increase or reduce voltage—in this case to reduce voltage. It is composed of a metal case containing oil in which is submerged an iron core about which are coils of insulated wire known as primary coils and which are

connected with the high voltage line. Secondary coils are also submerged in the oil and connected to the low voltage or service lines. The two coils are not connected, but when the transformer is functioning properly high voltage entering the primary coil, through the phenomenon of induction, impresses the lower voltage on the secondary coils from which this low voltage passes over the service lines. When this transformer was examined, it showed that the oil was dirty and burned and there was water therein and the transformer "shot." There was a hole burned through the insulation into the wires of the primary coil and test showed that the insulation between the primary coil and the case had broken down. There was expert testimony that there was no possibility of a short circuit occurring in the wires of the barn causing the damage which was found in the transformer and that, if the transformer had been grounded and the neutral of the secondary lines grounded and if there had been lightning arrestors at the transformers, no abnormal current of high voltage could have reached the barn, and that such precautions were ordinarily used to prevent unintended entrance of abnormal voltage or other causes. Also, there was expert testimony that the violent blowing off of the fuse caps in the bull barn was caused by an abnormal current of high voltage and that an abnormal current of high voltage would result in burning off the insulation in the barn and the resultant fire. There was testimony as to the nonexistence of the above precautionary measures of lightning arrestors and grounding. There was testimony that the wiring in the barns was in good condition.

The above showing that the lights in the bull barn and the pump motor worked prior to the fire but did not work subsequent thereto until the damaged transformer was replaced would indicate that the old transformer became defective on the day of the fire and the condition of the transformer and the violent blowing of the fuses in the bull barn would reasonably lead to the inference that a very high voltage current had passed through the transformer into the barn which was burned and thence to the fuses in the bull barn and that such high voltage current had caused the fire.

The testimony that there were methods of preventing the passage of this high current into the secondary wires and thence into the barn by the use of lightning arrestors, grounds on the secondary lines, or grounds on the transformer case and that the use of such devices was necessary and proper construction and that all of these were lacking in this construction would justify a finding that the company was negligent in not providing them and that because of such negligence the fire and resulting loss had occurred.

The above line of testimony, if believed by the jury, would have justified a verdict in plaintiff's favor. Therefore, such evidence was sufficient to carry the case to the jury and the trial court erred in directing the verdict.

## II.

### Rulings as to Evidence.

As this case will return for retrial, it is advisable to determine the challenged rulings concerning evidence. The first of these objections has to do with the court sustaining an objection to strike out evidence given by two witnesses as to changes in construction made by the company after the fire. These changes related to the installation of lightning arrestors and grounding the secondary wires and occurred after the fire and after installation of the new transformer. This testimony was received without objection and for that reason the motion to strike out, made at the close of the testimony of the witnesses, may, in a strict sense, be said to have been improper, but, in a broader sense, it was proper because such evidence is not proper as showing a negligent construction before the fire.

The next matter has to do with the ruling out of testimony by the court of witness Gossman that the wiring condition was the same on the date of the fire as at the time of installation of the new transformer. We think this ruling error. Before the new transformer was substituted, the evidence shows that neither the pump nor the lights in the bull barn would work, while after its installation they would. It was proper to show that the situation as to wiring was the same in order to establish the inference that the only change which caused this difference was in the two transformers.

Another matter is the refusal to permit an expert witness (Paine) to answer two hypothetical questions. It is not necessary to determine this matter as the ruling of the court was based on its view that certain facts deemed necessary to the question had not appeared in the testimony and this may be cured upon a retrial.

The next matter has to do with the exclusion of a plat (Plaintiff's Exhibit G) showing the approximate location of the transformer pole, the poles on the farm, the

252

wires and numbers of wires, and the way they ran on the farm. The objection to the introduction of this evidence was that it had not been properly identified. This objection should have been overruled as the plaintiff himself testified that it fairly showed the matters it purported to show and he was certainly familiar with those matters. The fact that the plat had been made by some one not familiar with the situation from information given him has nothing to do with the matter as it was not upon that basis of identification that it was offered. A further part of the objection was that it was incompetent, irrelevant, and immaterial, but such objection is not well founded as it was a proper if not a material link in plaintiff's case to explain to the jury the electrical set-up involved and the diagram would have aided in doing so.

■ The next matter has to do with the failure of the court to sustain an objection to a hypothetical question asked an expert witness (Corcoran) introduced by the defendant. The basis of the objection and the argument here is that one of the facts assumed in the question was contrary to the evidence. The question was aimed to elicit the effect upon a transformer of a shortage in the 110 volt circuit in the barn. One of the facts assumed is that the transformer was "furnishing 110 volts for servicing a building such as a barn." The testimony is slightly confusing as to which of the transformers here was involved in the question, but it seems that the defective transformer was intended. Taking this to be true, the objection should have been sustained as that transformer was not connected through its secondary wires with the barn, but directly with the pump house and was intended to furnish 220 volts there.

■ The next matter refers to sustaining an objection to a question asked on cross-examination of defendant's witness (Ford). This witness had attempted to describe the location of the different wires leading from the transformer to the barn and other wires in connection therewith. On cross-examination he was asked:

"Can you draw a plat of the wiring as it existed on that day of the fire so that we can have the lines as they ran to that transformer?"

The objection was that the question was incompetent, irrelevant, immaterial, and improper cross-examination. The objection should have been overruled. The question was directed to the matter concerning which the witness had testified in chief and was, therefore, proper cross-examination and the

location and number of these wires was a matter of difference between the parties and the plaintiff had a right to test the knowledge of the witness concerning the matter he had testified about.

■ The final matter is to the refusal of the court to permit certain evidence offered in rebuttal through witness (Paine). This evidence seems to relate to the effect of a shortage in the barn circuit upon a transformer if there were four instead of three wires leading from the transformer to the barn. The situation as to the difference in number of wires was developed during the testimony introduced by defendant. It would seem proper that the plaintiff in rebuttal should meet this new situation and the examination should have been permitted.

The judgment is reversed and the case remanded for a new trial.