FIDELITY & DEPOSIT CO. OF MARYLAND v. BATES, Superintendent of Banking of Iowa.

No. 10044.

Circuit Court of Appeals, Eighth Circuit.
March 8, 1935.

H. C. Kenline, of Dubuque, Iowa (R. P. Roedell, H. J. Hoffmann, H. F. Reynolds, and Kenline, Roedell, Hoffmann & Tierney, all of Dubuque, Iowa, on the brief), for appellant.

C. J. Lynch, of Cedar Rapids, Iowa (Donnelly, Lynch, Anderson & Lynch, of Cedar Rapids, Iowa, on the brief), for appellee.

Before SANBORN, WOODROUGH, and BOOTH, Circuit Judges.

SANBORN, Circuit Judge.

The appellee, who was the plaintiff in the court below, recovered a judgment against the appellant in an action upon a fidelity bond issued by the appellant to the Delaware County State Bank, from which judgment this appeal was taken. The parties will be referred to as in the lower court.

The bond in suit was issued September 8, 1930, and covered direct loss of money, not exceeding $20,000, sustained through any dishonest act of any of the employees of the bank, whether acting alone or in collusion with others, and discovered not later than a year after the cancellation or termination of the bond. By the bond, an employee was defined as an officer, clerk, or other person in the immediate employ of the insured at its office. The bond excluded losses resulting, directly or indirectly, from the act or acts of any director of the bank other than one employed as a salaried officer. The bond required the bank to notify the defendant within ten days after the discovery of a loss, to furnish proofs of loss within three months of the discovery, and to bring suit in not less than three months nor more than twelve months from the time the loss was discovered. Under a rider attached to the bond, the defendant assumed liability for losses sustained while a preceding bond, issued in 1920, was in effect, provided such losses were not discovered in time to permit suit under that bond.

The plaintiff's petition set up the bond; that J. P. Sloan was cashier of the bank while the bond was in force; that the bank sustained direct losses through the dishonest acts of Sloan, which losses exceeded in amount $20,000; that the defendant was duly notified of such losses, but refused to pay the same; and that the plaintiff was entitled to judgment for $20,000. The dishonest acts, and the losses resulting therefrom, as alleged in the petition, are in substance as follows:

1. Between June 18, 1930, and November 9, 1930, Sloan, without knowledge or authority of the board of directors of the bank, permitted C. V. Owens, a customer, to overdraw his account to the extent of $2,077.84, at a time when Owens had already exhausted his credit at the bank. Sloan, at the time this overdraft was permitted, was acting for Owens in a number of business transactions and was personally interested with Owens therein.

2. From September 1, 1931, to October 19, 1931, Sloan permitted checks drawn against the account of the Pennsylvania Oil Company to be paid, when their payment created an overdraft of $7,361.65, the checks so paid being withheld from posting for the purpose of concealing the existence of the overdraft. A note for $6,730 made by the oil company and Charles E. Cawley (represented to be the sole proprietor of the oil company) was given to the bank in order to partially cover such overdraft. This note, together with other notes given by the oil company, brought the aggregate of the indebtedness of the oil company and Cawley, its proprietor, to the bank to $20,302, or more than $5,000 in excess of the authorized line of credit granted to Cawley. The note was not paid, and the oil company and Cawley became bankrupt.

3. From October 18, 1931, to October 24, 1931, Sloan credited or paid or caused to be credited or paid to Cawley or to the oil company large amounts for checks drawn on other banks and not paid for lack of funds. The checks totaled $12,085.02, upon which the bank recovered only $168.13. Sloan knew of this check-kiting operation and actively aided Cawley and the oil company in obtaining these funds from the bank.

4. On or about October 22, 1931, Sloan, without the approval of the board of directors of the bank, took the oil company's note for $1,500, and on October 23, 1931, took its note for $2,770.76, crediting the amount of the notes to the account of the oil company, and permitting the withdrawal of these credits, which created overdrafts in addition to those previously referred to. The notes were not entered on accounts receiva-

ble, but were carried as "cash items." The notes were never paid, were uncollectible, and the amount of the additional overdrafts was lost to the bank.

5. Between January 1, 1932, and January 15, 1932, Sloan, while personally indebted to J. Jarvis and to C. E. Cawley, paid or directed to be paid, out of the funds of the bank, $2,087.97 on sight drafts and bad checks drawn for the benefit of the oil company, Cawley, and Jarvis, and this amount was lost except for a credit of $73.24.

The defendant, in its answer, admitted the Owens overdraft, but alleged that the directors knew of it and subsequently, without notice to the defendant, approved it by taking security therefor. The defendant further admitted the granting of an unsecured line of credit to Cawley; but alleged that it was customary for the bank to allow regular customers to overdraw their accounts, and to treat the checks deposited by them as cash items until covered; that this custom was followed with respect to the $7,361.65 overdraft of the oil company on October 20, 1931; that the bank, with knowledge, approved Sloan's acts in permitting this overdraft, by allowing further checks to be paid, and by accepting the oil company's notes after October 21, 1931. It alleged that the crediting of the worthless checks drawn on other banks by the oil company was according to the usual custom of the bank and was approved by it because, with knowledge that the checks had been dishonored, the bank, on and after October 21, 1931, continued to accept from the oil company bad checks and to give credit therefor. The defendant denied any dishonesty on the part of Sloan in connection with any of these transactions, and alleged that the bank had failed to comply with the terms of the bond with respect to the giving of notice or the furnishing of proofs of loss.

In its reply the plaintiff denied all affirmative allegations of the answer inconsistent with the facts as stated in its petition, and alleged that it had complied with the provisions of the bond relative to notice and proofs of loss, but that, if it had failed in that regard, the defendant had waived such failure.

Upon the issues made by the pleadings, the case was tried to a jury, which returned a verdict in favor of the plaintiff for $15,093.33.

There are 102 assignments and 92 specifications of error, the consideration of which has imposed upon counsel for the appellee and upon this court an unnecessary amount of labor. Since all that it is necessary to do in order to secure a reversal of a judgment in an action at law is to point out one substantial prejudicial error, it seems unfortunate that it should be thought necessary to call upon an appellate court to review almost every controversial question arising during the course of a long trial.

The specifications of error will be considered under the following headings:

Sufficiency of the evidence.

Exclusion of evidence.

Admission of evidence.

Alleged misconduct of the court.

Instructions.

Refusal of requested instructions.

### Sufficiency of the Evidence.

It is the contention of the defendant that none of the losses suffered by the bank were shown by any competent evidence to be the result of any dishonest acts on the part of Sloan, and that it was established that all of his acts which are complained of were subsequently ratified by the bank. It is also contended that the evidence conclusively showed that neither the bank nor the plaintiff had complied with the terms of the bond with respect to notice or proofs of loss, and that, for that reason also, there should have been a directed verdict for the defendant.

We are, of course, required to take that view of the evidence most favorable to the plaintiff. Gunning v. Cooley, 281 U. S. 90, 94, 50 S. Ct. 231, 74 L. Ed. 720; Limbeck v. Interstate Power Co. (C. C. A. 8) 69 F. (2d) 249, 250; P. F. Collier & Son v. Hartfeil (C. C. A. 8) 72 F.(2d) 625, 626.

The evidence shows that Sloan was an employee of the bank within the terms of the bond, that he was actively in charge of its affairs while the bond was in force, and that the losses which the bank suffered were due to his acts. The issues were, whether his acts were dishonest, whether they were ratified, and whether the bank had failed to comply with the terms of the bond with respect to notice and proofs of loss, or, if there was a failure in that regard, whether the defendant had waived it.

The evidence as to Owens' overdraft tended to show that Sloan had some personal interest in Owens. It appears that when Owens came to Delaware county, Iowa, from Colorado, Sloan wrote to the Colorado banks where Owens had previously done

business. He learned from them that Owens had been through bankruptcy, was visionary, and was inclined to plunge. Some of the banks recommended that no loans be made to Owens. At the time that Sloan permitted Owens to overdraw his account, Owens' notes were past due. It was shown that certain deposits in Sloan's personal account bore the notation "Owens." These deposits were $200 on October 1, 1930, $175 on October 8, 1930, $12.50 on October 17, 1930, $45.82 on October 23, 1930, and $500 on March 20, 1931. Aside from permitting overdrafts in the Delaware County Bank, Sloan assisted Owens to get credit at another bank, by guaranteeing payment of his obligations. The guarantees were signed on the stationery of Sloan's bank and signed by him as cashier. On one occasion, when he was asked to have Mr. Seeds, the president, sign such guarantees, Sloan demurred on the ground that Seeds knew nothing of the particulars and would hesitate to sign without investigation. Sloan borrowed $3,000 from Cawley, who in turn borrowed it from the Emmet County State Bank through its President Currell, to pay some of Owens' checks which were guaranteed by Sloan. At various times while Owens was dealing with the bank, Sloan signed checks in Owens' name in connection with farming operations of Owens. We think that the evidence was sufficient to justify the inference that Sloan, in permitting Owens to overdraw his account, was acting for the benefit of Owens and not solely for the benefit of the bank.

On October 19, 1931, the overdraft of the Pennsylvania Oil Company was $7,361.-65. On October 20 or 21, 1931, this overdraft was partially covered by a deposit consisting of a note for $6,730 which has never been paid and was uncollectible. The checks which caused this overdraft were not charged to the account of the oil company in the regular way, but were listed on "correction of error" deposit slips, and entered as regular deposits, thus concealing the overdraft. The checks were not posted to the ledger when the posting would cause the ledger to show the overdraft. It was known that overdrafts were criticised by the state bank examiner. The daily statement record of assets and liabilities was made with these "correction of error" slips entered as deposits, so that no actual shortage in cash was shown by the books, although it in fact existed. From September 21, 1931, to September 26, 1931, while the bank was being examined by the state examiner, no "correction of error" slips were used. Items covered by such slips prior to September 21 were charged to the oil company's account without creating an overdraft, because of a deposit by the oil company of checks on other banks sufficient to offset the actual overdraft. The checks deposited by the oil company, carried on "correction of error slips" and not posted, were handled in this manner by Sloan or upon his order or with his approval. Checks of the oil company on the bank which were sent in by correspondent banks were once returned, because of insufficient funds, by Seeds, the president, at a time when Sloan was away. Upon his return, Sloan called the banks which had sent in the checks and told them to return the checks for payment, which was done, although the oil company did not have on deposit funds with which to pay the checks.

Between October 19, 1931, and October 23, 1931, the bank received from the oil company and its supposed sole proprietor, Cawley, certain checks drawn on other banks. These checks were either paid or credited to the account of the oil company or Cawley, and the credits were used by them. The checks were not paid by the drawee banks, because of insufficient funds, and the bank lost $11,916.89 as a result. The total of the deposits in the accounts in the banks upon which the deposited checks were drawn was only a small fraction of the amount of the checks outstanding against such accounts. Part of these accounts in other banks consisted of deposits made by Mr. or Mrs. Jarvis. Jarvis, it appears, was a partner of Cawley in the oil company. The worthless checks deposited in the Delaware County Bank by the oil company were not charged back, but were carried as cash items until sometime in November, 1931, when an account called "other assets account" was opened, whereupon they were credited to that account. The assistant cashier credited checks drawn by the oil company on other banks to its account at the Delaware County Bank, at the direction of Sloan.

On October 22, 1931, the oil company's note for $1,500 was credited to its account in the bank, and on October 23, 1931, its note for $2,770.76 was also credited. The balance thus obtained was to cover bad checks cashed and uncollected. The notes were not entered in the note register, but were carried as cash items. They were

never paid, were uncollectible, and the bank lost $4,270.76.

During the first half of January, 1932, the check-kiting operations of the oil company were resumed; and the bank 'paid out $2,087.97 to Jarvis and the oil company by cashing or crediting worthless drafts and checks. The bank lost $2,014.73 on this transaction.

On February 17, 1930, a loan committee had been established at the bank, and all loans of more than $250 were required to be approved by it. The granting of credit to Owens and to the Pennsylvania Oil Company, by means of overdrafts, was never authorized or approved by this committee nor by the board of directors of the bank; and the acceptance of the oil company's $6,730 note to take up part of its overdraft brought the joint indebtedness of the oil company and Cawley to over $20,000. Cawley's established line of credit was $15,000, and the oil company had no credit. The loan committee never authorized the $6,730 note or the notes for $1,500 and $2,770.76.

The directors of the bank learned of the Owens overdraft, of the September and October, 1931, overdraft of the oil company, and of the October, 1931, check-kiting operation, on November 5, 1931. They did not, however, learn of the use of the "correction of error" deposit slips or of the discrepancies between the daily statements and the ledger, or of the other manipulation of accounts, until they received the report of an auditor in April, 1932. They learned of Sloan's indebtedness to Cawley and to Jarvis at a board meeting on February 29, 1932, when Sloan resigned his position as cashier. On March 3, 1932, the bank wrote to the defendant, by registered mail, informing it of the resignation of Sloan, and stating that, in conferences held concerning such resignation, the board of directors had first learned that Sloan had so handled some of the bank's matters that there was a possibility of liability under the bond, and that steps had been taken for an audit. The 'defendant replied to this letter on March 7, 1932, to the effect that the matter was being referred to Mr. Laurenson, its adjuster in Chicago, and suggesting that further developments be taken up with him. Laurenson called at the bank and made some investigation. The plaintiff, who had taken over the affairs of the bank on May 24, 1932, sent proofs of loss to the defendant on June 3, 1932, by registered mail. The proofs were received on June 6. Laurenson continued his investigation with the help of the employees of the plaintiff, and no objection to the sufficiency or timeliness of the notice or proofs of loss was made prior to the commencement of suit. Laurenson had stated to the examiner in charge of the bank that any loss shown to be the result of a dishonest act of Sloan would be paid without suit.

■ Did the evidence justify a finding that the bank's losses were due to dishonest acts of Sloan? The meaning of the word "dishonesty" as used in a fidelity bond has been discussed by this court in United States Fidelity & Guaranty Co. v. Egg Shippers' Strawboard & Filler Co. (C. C. A. 8) 148 F. 353, 355. We said:

"The test is not whether he intended to personally profit by his course, though that he did is perhaps a permissible inference from the facts shown. He occupied a position of trust and confidence which he secretly betrayed. He received compensation for guarding the interests of his employer and he was willfully, intentionally, and grossly faithless. This is not a case of mere indiscretion or error of judgment. There was a breach of trust, a want of financial integrity, coupled with deceit and concealment, and resulting in financial loss to the employer. This was both fraud and dishonesty within the meaning of the bond. Cases involving fidelity bonds insuring against 'embezzlement and larceny' or 'fraud and dishonesty amounting to embezzlement or larceny' are obviously not in point. * * * In the bond before us the terms 'fraud' and 'dishonesty,' while relating to pecuniary matters, are employed in a broader and more comprehensive sense. They are not restricted to such conduct as imports a criminal offense."

In Citizens' Trust & Guaranty Co. of West Virginia v. Globe & Rutgers Fire Ins. Co. (C. C. A. 4) 229 F. 326, 329, page 330, Ann. Cas. 1917C, 416, an action on a fidelity bond limiting liability to loss sustained "by reason of the fraud or dishonesty of the employee," the court said:

'"The meaning of fraud and dishonesty extends beyond acts which would be criminal. They are to be given a broad signification, and taken most strongly against the surety company. City Trust, Safe Deposit & Surety Co. v. Lee, 204 Ill. 69, 68 N. E. [485], 488."

And in Maryland Casualty Co. v. American Trust Co. (C. C. A. 5) 71 F.(2d) 137, 138, the court used this language:

"Insurance against dishonest acts is insurance of fidelity; it is intended to, it does, guarantee openness and fair dealing on the part of the bank's officers. It is intended to, it does, underwrite that the bank's officers shall act with common honesty and an eye single to its interests."

See, also, Brandon et al. v. Holman (C. C. A. 4) 41 F.(2d) 586; London & Lancashire Indemnity Co. of America v. People's Nat. Bank & Trust Co. (C. C. A. 7) 59 F. (2d) 149; United States Fidelity & Guaranty Co. v. Bank of Thorsby (C. C. A. 5) 46 F.(2d) 950; Andrew, State Superintendent of Banking, v. Hartford Accident & Indemnity Co., 207 Iowa, 652, 223 N. W. 529; Exeter Banking Co. v. Taylor, 85 N. H. 458, 160 A. 733; World Exchange Bank v. Commercial Casualty Ins. Co., 255 N. Y. 1, 173 N. E. 902. In the case last cited, Judge Cardozo (now Mr. Justice Cardozo) said (pages 903, 904 of 173 N. E., 255 N. Y. 1):

"The question is perhaps closer whether the act within the meaning of the policy must be said to be 'dishonest,' for dishonesty within such a contract may be something short of criminality. * * * The appeal is to the mores rather than to the statutes. Dishonesty, unlike embezzlement or larceny, is not a term of art. Even so, the measure of its meaning is not a standard of perfection, but an infirmity of purpose so opprobrious or furtive as to be fairly characterized as dishonest in the common speech of men. 'Our guide is the reasonable expectation and purpose of the ordinary business man when making an ordinary business contract.' Bird v. St. Paul Fire & Marine Ins. Co., 224 N. Y. 47, 51, 120 N. E. 86, 87, 13 A. L. R. 875; Silverstein v. Metropolitan Life Ins. Co., 254 N. Y. 81, 84, 171 N. E. 914.

"If this standard is to govern, we think the quality of the teller's act is for the triers of the facts."

Like the question of negligence, the question of dishonesty must be left to the triers of fact if there is a conflict in the evidence, or even if there is no conflict, provided fair-minded men might honestly reach different conclusions. It seems clear to us that, under the evidence, the question as to whether the losses occasioned by the acts of Sloan were due to his dishonesty was a question for the jury. His acts in allowing overdrafts and in the kiting of checks must have been attributable to at least one of three things: Dishonesty, negligence, or utter incompetence. The jury evidently reached the conclusion that he was not merely negligent nor merely incompetent. They saw the witnesses, including Sloan, and heard them testify. We would have no disposition to disturb their findings, even if we had the power to do so.

As to ratification: The action taken by the bank, after the losses had occurred, to minimize them through the taking of security was not a ratification of Sloan's dishonest conduct and did not relieve the defendant from its liability under the bond. The bank, in taking security, did no more than what it was required to do in order to reduce its losses to their lowest possible terms, and thus save what it could for itself and for the surety on the bond. Moreover, it was not shown that when the security was taken the directors had any knowledge that Sloan had acted dishonestly.

So far as the giving of notice and proofs of loss by the bank to the defendant is concerned, we think the trial court was not required to hold as a matter of law that the provisions of the bond had not been complied with or that compliance had not been waived. True, the bank knew of the losses long prior to notifying the defendant, but the claim is that it did not know that the losses were within the coverage of the bond, because it was not then realized that they were due to Sloan's dishonesty. There is substantial evidence to support that claim. The bond required the bank to give notice only of losses which were covered by the bond. There was evidence which would justify the jury in concluding that notice was given and proofs of loss were made as soon as the directors were aware that the losses were due to Sloan's dishonesty. See American Surety Co. v. Pauly, 170 U. S. 133, 145, 147, 18 S. Ct. 552, 42 L. Ed. 977; National Surety Co. v. Western Pacific Ry. Co. (C. C. A. 9) 200 F. 675, 680–684; National Surety Co. v. Massachusetts Bonding & Insurance Co. (C. C. A. 2) 19 F.(2d) 448. Furthermore, there was substantial evidence that the defendant had waived compliance with the requirements as to notice and proofs of loss, and the jury would have been justified in so finding.

The defendant also contends that the court should not have submitted to the jury the issue of alleged conspiracy of the oil company, Cawley, and Jarvis to obtain the bank's money by the October check kiting. Since the verdict is the exact amount of the other losses, it shows to a mathematical cer-

tainty that the jury eliminated this item in assessing damages. The submission of that issue, therefore, could not have been prejudicial. However, in our view, the charge of conspiracy was nothing more than the charge of dishonest conduct on the part of Sloan in collusion with others in paying or crediting bad checks, whereby the bank suffered the loss. That Cawley was a director of the bank we regard as unimportant. It was the losses due to Sloan's acts and not those of Cawley for which recovery was sought.

### Exclusion of Evidence.

██ The defendant argues that the court erred in excluding evidence of a custom of the bank of deferring the posting of checks creating an overdraft. The fact is that the dishonest acts complained of were the extension of credit by means of overdrafts. The manipulation of the books merely tended to characterize Sloan's conduct. Proof that a dishonest or illegal custom of withholding entries from the books existed, would not, in our judgment, have been of any help to Sloan or to the defendant. Hubbard Fertilizer Co. of Baltimore City v. American Trona Corporation, 142 Md. 246, 120 A. 522; Vial et al. v. Paradis, County Treasurer, etc., et al., 44 Idaho, 157, 255 P. 643, 53 A. L. R. 191. The Iowa Code 1931, § 9282, makes false entries in the books of a bank a criminal offense.

██ The defendant complains of the exclusion of the testimony of cashiers of other banks in the check-kiting ring, to the effect that they knew nothing of the check-kiting prior to the "blow-up." While it is argued that the exclusion of this testimony was undue restriction of cross-examination, the record discloses that the defendant sought to introduce it, and that it was excluded, not as improper cross-examination, but as wholly immaterial. What the cashiers of these banks knew or did not know about the check-kiting had no tendency to prove or disprove Sloan's knowledge of what was going on; and the ruling was correct. Moreover, this evidence related to a loss which was excluded by the jury in its verdict.

██ The defendant excepted to the exclusion of the Owens' liability ledger, several of Owens' notes given to the bank with the mortgages securing them, and his financial statement furnished to the bank as a basis for credit. The contention is that these exhibits would have evidenced an honest desire on the part of Sloan, in allowing the Owens' overdrafts, to protect the interests of the bank with respect to Owens' existing indebtedness and the security given therefor. So far as the liability ledger was concerned, it was admitted with another group of exhibits. Sloan, as defendant's witness, testified as to the financial statement which was furnished by Owens in 1928, showing a net worth of $100,000. He also testified that the bank held Owens' notes aggregating $6,000 in the spring of 1930 with a chattel mortgage as security. A chattel mortgage given by Owens in 1928 was in evidence. The only other notes and mortgages sought to be introduced were those executed after the overdrafts had been allowed. The taking of security at that time had no bearing upon the motive of Sloan in allowing the overdrafts. Sloan's testimony as to Owens' indebtedness, his financial statement, and the security taken from him, was uncontradicted and served every purpose that the introduction of the instruments themselves would have served.

██ The next complaint is that the court erred in excluding the minutes of the meeting of the board of directors of December 7, 1931, at which meeting Sloan was re-elected cashier, and in excluding the testimony of the witness Klaus to the effect that security was taken from Cawley in November, 1931, to cover obligations of the oil company to the bank. It was claimed that this evidence would show ratification by the bank of Sloan's acts. In the absence of proof that on December 7, 1931, the bank knew that the losses complained of were due to the dishonesty of Sloan, the evidence of his re-election was without significance and added nothing to what was already known, namely, that he continued to be the cashier of the bank until he resigned. By the terms of the bond, the liability of the defendant terminated as to any employee upon the discovery of his default. The testimony of Klaus as to the taking of security was sought to be elicited in cross-examination and related to a matter not referred to on direct examination. Hence, the court was justified in excluding it on that ground alone, but, as already pointed out, the taking of security by the bank for the indebtedness of Cawley and the oil company, no matter how it was incurred, could not, in the absence of the knowledge of the bank of Sloan's dishonesty, prejudice the rights of the bank against the defendant for losses actually covered by the bond.

## Admission of Evidence.

In questioning certain witnesses, counsel for the plaintiff asked them when they had learned of the "concealment" or the "practice of concealing" overdrafts by the use of "correction of error" deposit slips. It is contended that these questions were improper, because they assumed a fact in issue, namely, concealment. At the time the questions were asked, it had already been shown that "correction of error" slips had been used and that the effect of their use was to prevent the books from showing the true facts with respect to overdrafts. The questions were not improper under the circumstances, and the jury could not have been misled by the language used.

The admission of the records of the "outside" banks which had participated in the check-kiting operations, was not error. The purpose of this evidence was to show what actually took place. It was necessary for the plaintiff to show that there was kiting of checks and also that Sloan knew of and permitted it.

The contention that the testimony of the witness Klause as to discrepancies between the daily statement and the ledger was inadmissible, was not presented by any assignment of error, and will not be considered. Pierce et al. v. United States, 255 U. S. 398, 405, 41 S. Ct. 365, 65 L. Ed. 697.

Complaint is made that certain exhibits consisting of the auditor's tabulations made from the records of the bank and other banks involved in the check-kiting scheme, and the auditor's testimony given from such tabulations, were inadmissible because all of the records upon which such tabulations were based were not in evidence. The auditor had testified that his tabulations were made up from only those records which were in evidence. The defendant now calls attention to the fact that the daily statement and the overdraft book were not introduced. It is not clear that the tabulations were in any way based upon these records, but, even if they were, we would still be of the opinion that the court ruled properly upon the defendant's objection, which failed to point out specifically that these tabulations were in part based upon these records and that the records were not themselves in evidence.

In Noonon v. Caledonia Gold Mining Company, 121 U. S. 393, 400, 7 S. Ct. 911, 915, 30 L. Ed. 1061, the Supreme Court said:

"Objections to the admission of evidence must be of such a specific character as to indicate distinctly the grounds upon which the party relies, so as to give the other side full opportunity to obviate them at the time, if, under any circumstances, that can be done."

See, also, Jeffreys v. O'Neal (C. C. A. 4) 64 F.(2d) 284.

It is claimed that the testimony of the witness Currell, with respect to making Cawley a loan to enable Sloan to make good his guaranty of Owens' checks, should have been excluded. Evidence of Sloan's relations with Cawley and Owens was admissible as tending to characterize Sloan's conduct in permitting the overdrafts which caused the losses, and the inquiry in that regard was properly permitted to take a wide range. United States Fidelity & Guaranty Co. v. Egg Shippers' Strawboard & Filler Co. (C. C. A. 8) supra, 148 F. 353, 355.

We think there is no merit in the contention that the testimony of the attorney of the bank to the effect that Laurenson, the adjuster for the defendant, stated to the examiner in charge of the liquidation of the bank, that whatever loss was proven to be the result of the dishonesty of Sloan would be paid without suit, was inadmissible. Laurenson was shown to have apparent authority to waive the conditions of the bond relative to notice and proofs of loss. See, in this connection, Hall v. Union Indemnity Co. (C. C. A. 8) 61 F.(2d) 85. However, if the testimony was inadmissible, it could not be held to be prejudicial, since the examiner himself testified to the same effect, without objection. St. Louis & S. F. R. Co. v. Duke (C. C. A. 8) 192 F. 306, 309.

An affidavit of Rose Morrissey, a bookkeeper of the bank, stating that "on numerous occasions" between the dates of September 1, 1931, and October 20, 1931, "a number of checks drawn by the Pennsylvania Oil Company on its checking account in said bank were, by J. P. Sloan, then cashier of said bank, or with his approval or under his direction, ordered withdrawn from the other vouchers making up the total of the previous day, and a correction deposit slip placed in the vouchers and records of such total in the place and in lieu of such checks and said checks were not posted on the checking account of the said Pennsylvania

Oil Company in the checking account ledger of said bank as a part of the business of said bank for such date," was received in evidence, on cross-examination, as tending to impeach her as a witness for defendant. The defendant argues that this affidavit should not have been admitted. The record shows that Miss Morrissey, a witness for the defendant, on cross-examination testified, without objection, that she had made the affidavit and that she believed it to be true at the time she made it. That portion of it which the cross-examiner regarded as inconsistent with her direct testimony was read to her. She said that it was true when made. On redirect examination, counsel for the defendant said: "Now, Miss Morrissey—Where is that statement, 'Pltfs. Ex. #89' " (the affidavit). Counsel for plaintiff thereupon remarked, "I will offer that in evidence if you desire to interrogate her upon it." Objection was interposed by defendant's counsel that no proper foundation had been laid, and that it did not contradict anything which she had testified to. It was received in evidence. There was no error in this ruling. See Farmers' & Merchants' State Bank v. Barnes et al., 198 Iowa, 805, 200 N. W. 430; Vich v. Watts & Foote et al., 155 Iowa, 664, 136 N. W. 910. Even if it had been error to receive the affidavit, no prejudice could have resulted. If the affidavit was consistent with Miss Morrissey's testimony, no harm was done to the defendant.

■ The defendant alleges error in the denial of its motion to strike certain evidence. The evidence covered by the motion is mainly that referred to in the specifications of error already considered. The items not so covered, namely, evidence of Sloan's indebtedness to Cawley and Jarvis, of the purchasing of feed for Owens' livestock by Sloan, and of the five items of deposit in Sloan's account apparently charged to Owens, we regard as admissible for the purpose of showing the general course of conduct of Sloan, under the rule announced in United States Fidelity & Guaranty Co. v. Egg Shippers' Strawboard & Filler Co. (C. C. A. 8) supra, 148 F. 353, 355.

### Alleged Misconduct of the Court.

■ The defendant contends that the court erred in examining the witness Klaus with respect to the use of "correction of error" slips to cover overdrafts. We quote a part of the examination complained of:

"By the Court: "Q. Was there any error that was corrected in fact? A. None to my knowledge.

"Q. These so-called 'Correction of Error' tickets were simply an instrument used to cover up a shortage that would be shown by reason of the overdrafts? A. Yes. * * *

"Q. But there would be a shortage of cash, would there not? A. No, there would not be any shortage of cash. * * *

"Q. That would be true so far as figures and amounts were concerned, but I am talking about the assets of the bank? There was a shortage of cash in the bank as soon as cash was paid out on checks against that account in the bank and against which there was nothing to draw the check so paid out? A. These checks had been paid out on those items.

"Q. Then your cash was short to that extent, wasn't it? A. No, our cash wasn't short; it balanced with the amount shown on the books.

"Q. Well, it balanced with the books by reason of this manipulation of figures? A. Yes.

"Q. And before that false entry was made it wouldn't balance, would it? A. No, the accounts wouldn't balance if those correction of error tickets had not been put in."

The defendant's contention is that the trial judge virtually forced the witness to yield his own views to those of the court, and that the court assumed that there was a manipulation of figures and false entries and a shortage in the cash. The contention is utterly without merit. The court was merely trying to show what the actual effect of the use of these "correction of error" slips was, so that the jury would not be misled.

"The trial judge in a federal court is not a mere presiding officer. It is his function to conduct the trial in an orderly way with a view to eliciting the truth, and to attaining justice between the parties. It is his duty to see that the issues are not obscured, that the trial is conducted in a proper manner, and that the testimony is not misunderstood by the jury, to check counsel in any effort to obtain an undue advantage or to distort the evidence, and to curtail an unnecessarily long and tedious or iterative examination or cross-examination of witnesses. He has the authority to interrogate witnesses, and to express his opinion upon

the weight of the evidence and the credibility of the witnesses." Kettenbach et al. v. United States (C. C. A. 9) 202 F. 377, 385.

### Instructions.

■ There are nine assignments of error relating to the court's charge, but only four of them, with the specifications based thereon, comply with the rule that the portion of the charge referred to must be set out. Only those four will be considered. Ford Motor Co. v. Brady (C. C. A. 8) 73 F.(2d) 248; Haldane et al. v. United States (C. C. A. 8) 69 F. 819, 821; Fisher Machine Works Co. v. Dougherty (C. C. A. 8) 231 F. 910, 912.

The first instruction to be considered is as follows:

■ "The defendant has also asked me to instruct you that the permitting of an overdraft is not illegal. The permitting of an overdraft merely is not necessarily illegal, but, of course, if the overdraft is permitted as a substitute for the making of an illegal loan, and to extend credit after a customer has exhausted his full line of credit, that would be illegal, if permitted by an officer of the bank in violation of the established line of credit by the Board of Directors."

The defendant contends that this instruction was erroneous, citing The First National Bank of Edgewater, N. J., v. National Surety Company, 243 N. Y. 34, 152 N. E. 456, 46 A. L. R. 967, which held that an instruction that the permitting of an overdraft or the overdrawing of an account was an act in violation of law, a criminal act, or a dishonest act, was erroneous. But it is clear that the court, in the case at bar, used the word "illegal" not as meaning criminal, but as meaning dishonest, and the jury could not have misunderstood the effect of the instruction or have been misled by it, since they had been clearly instructed that the issue in the case was not whether Sloan had committed a criminal act, but whether he had committed a dishonest act. Sloan's act in permitting the overdraft was illegal in the sense that he violated a duty imposed upon him by law in extending unauthorized credit to Owens.

■ The second instruction which is complained of and which will be considered is:

"You are instructed that by the terms of the bond sued upon the defendant agreed to indemnify the Delaware County State Bank against direct losses sustained through any dishonest act of J. P. Sloan,

Cashier of said bank, whether acting alone or in collusion with others. The word 'dishonesty' is to be given a broad significance and includes any acts done in breach of the officer's duty to the bank and any wilful omissions to discharge the duties of his office. It does not embrace mere carelessness or negligence in the discharge of duty, but does include any acts done in violation of the officer's obligation to faithfully perform the duties of his office, whether such acts be criminal or not."

It has already been demonstrated in this opinion that this instruction was accurate.

■ A third instruction is:

"You are further instructed that under the terms of the bond sued upon it is not necessary that the plaintiff establish that the acts of dishonesty resulting in direct losses to the bank were solely those of J. P. Sloan, the cashier, if you find that such direct losses were the result of dishonest acts of the said J. P. Sloan acting in collusion with others, and, if you so find, the defendant would be liable for the losses directly resulting from the dishonest acts proven, in the event such dishonest acts were either those of Sloan alone, or, of his dishonest acts in association or collusion with others, which together produced the resulting loss to the bank."

The defendant claims that this instruction does not limit possible collusion between Sloan and others to those persons mentioned in the petition, namely, Cawley and Jarvis, and that it permitted the jury to assess damages for losses due to acts other than those of Sloan. We do not so understand the instruction. The court explained to the jury that they might allow recovery for losses caused by Sloan's dishonest acts even though those acts were participated in by others.

■ Another instruction complained of is:

"However, I further charge you, that even though the bank or the plaintiff failed to give the required notice, or furnish the required proof of loss, that those requirements might be waived by the defendant, and if the defendant on receiving notice and proof of loss, even though at later dates than required in the bond, and the defendant made no protest in that respect, but having received the same, thereafter without protest did the things alleged in the plaintiff's reply, that is, replied by letter without protest as to the allowance of notice and proof of loss, and referred the mat-

ter to said Laurenson, its agent, for investigation and cooperation with the plaintiff, and that said Laurenson called upon the plaintiff at the banking house of the Delaware County State Bank, and conferred with the plaintiff upon the subject, and still made no protest, but assured the plaintiff that any loss attributable to the dishonesty of said Sloan would be paid, and plaintiff relying thereon, devoted time, labor and expense in prosecuting this action, then such conduct upon the part of the defendant and its agents would be a waiver of any irregularity or delay in the giving of notice or the furnishing of proofs of loss, and the defendant would now be estopped from raising that question in this action."

This instruction, we think, is not subject to criticism. See Nicholas v. Iowa Merchants' Mut. Ins. Co., 125 Iowa, 262, 101 N. W. 115, 118; Citizens' Trust & Guaranty Co. v. Globe & Rutgers Fire Ins. Co. (C. C. A. 4) supra, 229 F. 326, 328, Ann. Cas. 1917C, 416; Weed v. Hamburg-Bremen Fire Ins. Co., 133 N. Y. 394, 31 N. E. 231, 234; Home Insurance Co. of New York v. Sullivan Machinery Co. (C. C. A. 10) 64 F. (2d) 765, 767; Concordia Insurance Company of Milwaukee v. School District No. 98 of Payne County, Okla., 282 U. S. 545, 548-550, 51 S. Ct. 275, 75 L. Ed. 528; Equitable Life Assur. Soc. of the United States v. Winning (C. C. A. 8) 58 F. 541, 546.

### Refusal of Requested Instructions.

One group of assignments of error is directed to the court's "failure to instruct on issues." None of these assignments set out the requested instructions refused, and they will therefore be disregarded. Ford Motor Co. v. Brady (C. C. A. 8) supra, 73 F.(2d) 248, 250.

The only refused instructions which were brought up by proper assignments and which are also argued in the brief are the following:

"25. To limit the effect of the letter of March 3, 1932, to the issue of timely notice of loss."

"26. To limit the effect of the letter of June 3, 1932, with attached so-called proofs of loss and copy of Potwin report, to the issue of timely furnishing of proofs of loss."

"41. To inform the jury that, under the statutes of Iowa, loans of the bank's funds are required to be made by an executive officer, and not by a Loan Committee."

"37. To inform the jury that, under the statutes of Iowa, the directors are charged with the duty of managing the business affairs of the bank."

"38. To inform the jury that the directors are responsible for permitting the system of records by which the bank's transactions are kept and preserved."

"39. To inform the jury that, under the statutes of Iowa, the board of directors is required each year to select an Examining Committee, which Committee is required to make quarterly examinations each year of the condition of the affairs of the bank, which reports must be presented to the board of directors, and preserved as part of the minutes of the board, and two of which reports must be filed with the Superintendent of Banking."

"40. To inform the jury that knowledge of the Examining Committee, with respect to the system of keeping a record of the bank's transactions, is imputed to the board of directors and to the bank."

"31. To inform the jury that there is no competent evidence of any concealment of any alleged overdraft from either the State examiners, the Examining Committee, or the officers."

These we set out, not in the order in which they were requested, but in the order in which they are argued in the brief. The first two of the quoted instructions were properly refused because not properly formulated. See 64 C. J. 858, § 689.

The defendant contends that the third requested instruction set out above was required by Iowa Code 1931, § 9221-c3, providing that, "No loan * * * shall be made from the funds of any state bank, * * * directly or indirectly except by an active executive officer. * * *" This obviously did not prevent the bank from having a loan committee, nor from requiring that before a loan was made it should be approved by such committee.

The remaining requested instructions, above referred to, relate to the issues of dishonesty and ratification. The court's charge on these issues we regard as full, fair, and accurate. There was no error in refusing to give these requested instructions.

A number of the questions sought to be raised by the specifications of error have not been considered because not argued in appellant's brief, and therefore

waived. E. R. Squibb & Sons v. Mallinckrodt Chemical Works (C. C. A. 8) 69 F. (2d) 685, 687; United Iron Works, Inc. v. Woolsey (C. C. A. 8) 39 F.(2d) 385, 386; Schevenell v. Blackwood, State Highway Commissioner et al. (C. C. A. 8) 35 F.(2d) 421, 422. Other questions argued in the brief are not supported by proper assignments or specifications of error and have therefore not been discussed.

Since, in our opinion, the plaintiff is entitled to an affirmance of the judgment upon the merits, we have deliberately disregarded questions of appellate practice and procedure, the consideration of which would have produced the same result.

The judgment is affirmed.