**LONDON & LANCASHIRE INDEMNITY CO. OF AMERICA v. PEOPLES NAT. BANK & TRUST CO.**

No. 4657.

Circuit Court of Appeals, Seventh Circuit.

May 26, 1932.

Charles E. Henderson, Albert Stump, Laurens L. Henderson, and Lloyd D. Claycombe, all of Indianapolis, Ind., for appellant.

Sidney S. Miller and Samuel D. Miller, both of Indianapolis, Ind., and Charles D. Hunt, of Sullivan, Ind., for appellee.

Before ALSCHULER, EVANS, and SPARKS, Circuit Judges.

ALSCHULER, Circuit Judge.

Appellee was for years a national bank at Sullivan, Ind., under the name of National Bank of Sullivan. November 19, 1928, it acquired the assets and business of another bank there and continued its banking business there under the name of Peoples Nation-

al Bank & Trust Company. One Maple had long been its trust officer and cashier, and after November 19, 1928, was trust officer and vice president.

Under date of December 13, 1928, appellant, an indemnity company, issued to appellee its blanket indemnity bond wherein, in consideration of an annual premium, appellant agreed to indemnify appellee against loss, to an amount not exceeding $50,000, through any dishonest act of any of appellee's employees, as well as through robbery, burglary, theft, and the like.

Alleging loss sustained through dishonest acts of Maple, appellee brought suit against appellant upon the bond and recovered judgment, from which this appeal is prosecuted. The judgment was for $15,750, which, under the court's charge and as stated in the verdict itself, is composed of:

First, $5,000 for loss incurred through the dishonest acts of said Maple prior to date of appellant's bond;

Second, $5,000 for loss occurring after date of the bond through Maple's dishonest act in respect to certain Baird drafts;

Third, $4,000 for loss occasioned by the disappearance of that amount on the morning of January 16, 1929;

Fourth, $1,750 of interest upon these amounts.

As bearing on the first item, it appears that under date of March 12, 1927, the Metropolitan Casualty Insurance Company of New York, an indemnity company, in consideration of an annual premium, agreed to indemnify the National Bank of Sullivan against loss through dishonesty on the part of any employee to the amount of $5,000 for each of such employees of the bank. In this contract it is provided:

"(4) That loss is covered hereunder only if the acts causing such loss occur while this insurance is in force and are discovered and reported to the Underwriter within two (2) years after the termination of this insurance."

"(7) That this insurance shall become effective as of the date of this instrument, and shall remain in force until cancelled; and this insurance shall be deemed cancelled upon the date that may be specified in a written notice of cancellation served by the Underwriter upon the Insured or by the Insured upon the Underwriter. * * * "

Upon appellant's indemnity bond becoming effective, the Metropolitan bond was duly canceled according to its terms; and to appellant's bond there was then attached a rider, under same date as the bond itself, wherein it was recited that theretofore the beneficiaries of the new bond had carried indemnity fidelity insurance in the Metropolitan Casualty Company of New York, and that such fidelity suretyship had been allowed to expire, or had been canceled or terminated, as of the date of the new bond executed by appellant, and that:

"Whereas, said fidelity suretyship may provide that any loss thereunder shall be discovered, or claim therefor shall be filed, within a certain period after the final expiration, cancellation or termination thereof.

"Now, therefore, it is hereby understood and agreed as follows:

"1. That the attached bond shall be construed to cover, subject to its terms, conditions and limitations, any loss or losses under said fidelity suretyship which shall be discovered after the expiration of any such period, or if no such period, after the bar of the statute of limitations, and before the expiration of the time limited in the attached bond for the discovery of loss thereunder, and which would have been recoverable under said fidelity suretyship, had it continued in force, and also under the attached bond, had such loss or losses occurred during the currency thereof.

"2. That there shall be deducted from the amount of the attached bond any sum or sums that may be paid by the Underwriter under said fidelity suretyship and/or under the attached bond and this rider on account of any loss or losses under said fidelity suretyship, but any sum or sums so deducted shall be restored to the attached bond as therein provided.

"3. That the liability of the Underwriter under the attached bond and this rider on account of any loss or losses under said fidelity suretyship shall not exceed the amount of the attached bond on its date of issue, less all deductions on account of payments made under the attached bond, and less all deductions provided for herein.

"4. That nothing in the attached bond or this rider contained shall be considered or construed to render the Underwriter liable for a greater amount on account of any loss or losses under said fidelity suretyship than would have been recoverable thereunder had it continued in force, or to increase the time for discovering, or making claim for, loss under said fidelity suretyship beyond what would have been the time had it continued in force."

It is appellant's contention that by this rider it did not assume generally to pay for all losses which occurred prior to issuance of its bond, and while the Metropolitan indemnity was in force, and that it is not liable for this first item. Appellee contends that the rider was an assumption by appellant of any loss occurring prior to the issuance of its bond, and for which the Metropolitan would have been liable. The District Court agreed with appellee, and charged the jury accordingly.

A careful study of the rider convinces us that appellant did not thereby undertake the assumption of any and all liability which might accrue under the Metropolitan contract, but only such as, accruing while the Metropolitan contract was in force, would not, under that contract, be enforceable if not discovered within two years after the Metropolitan contract was terminated. By the terms of that contract, a loss occurring while it was in force would be recoverable if discovered within two years after termination of the contract; but if discovered more than two years after termination no action would lie. Had the contract remained in force, the right of recovery would have persisted until the loss was discovered. Therefore, in canceling the Metropolitan contract the bank was deprived of the right of recovery for a loss occurring thereunder which was not discovered within two years after the cancellation. The new bond carried no indemnity against loss accruing prior to its issue, and it was to indemnify the bank against loss occurring prior to the issue, but not discovered within two years after termination of the prior contract, that the rider was attached.

The wording of the rider is involved and quite difficult to follow, but in our judgment the foregoing is its true intent and scope.

This alleged loss having been discovered by the indemnified bank within two years after the cancellation of the Metropolitan contract, it follows that it is not a loss for which appellant, by its rider, assumed to indemnify appellee, and it was not recoverable against appellant. It will therefore be unnecessary here to inquire into the merits of the contentions respecting Maple's alleged dishonest acts as the cause of that asserted item of loss.

Item two arises out of a $5,000 draft drawn January 2, 1929, to the order of one Bolinger, through a bank at Shreveport, La., signed, "Samuel K. Baird, J. F. B." (which are Bolinger's initials), and credited by appellee to the account of the First State Bank of Shelburn, Ind., of which Bolinger was president. The draft was dishonored, and the amount so credited became lost to appellee through its withdrawal by Bolinger's bank.

If the only facts to be considered were those in relation to the actual drawing and crediting of the draft, it might well be that dishonest action by Maple did not appear in this transaction; but viewed in connection with the antecedent facts and circumstances a decidedly different picture is presented.

Bolinger's bank was small, having a capital of $25,000. Appellee bank had a capital of $100,000. Maple's father-in-law, a man in the late seventies, was its president, and Maple was in practical control of the bank. The banks were located in nearby towns, and Maple and Bolinger had long been well acquainted. Bolinger's bank had been carrying a deposit with appellee, and in about 1926 began rediscounting its notes there. During 1927 these rediscounts with appellee ran up to $50,000 or $60,000, and, as Bolinger testified, were what kept his bank going. In 1928 such rediscounts and assignments of notes amounted to $125,000 in December. Bolinger had long been speculating in the stock market, and losing heavily. He had borrowed much money from his own bank, and in 1926 began raising money on forged notes. Many of the forged notes found their way into appellee bank, and at the time of the Baird transaction the forged notes so passed to and then held by appellee bank amounted to upwards of $115,000. It does not appear how many of these notes Maple knew to be forged, but he had actual knowledge of a number of the forgeries. The arrangement between him and Bolinger was that notices of maturities (of the notes which came to appellee through Bolinger) were to be sent to Bolinger instead of to the apparent makers; but several of the notices were by mistake sent to the purported makers, and in some instances the person notified came to Maple and denied the genuineness of the note. Thereupon Bolinger would turn over to Maple other paper—mostly forged—and the alleged maker who complained would be absolved from responsibility. Bolinger would pay the interest on the forged paper.

It appears from the evidence that Maple could not have failed to appreciate that there was something radically wrong in these numerous transactions. The amount of these notes which appellee thus held—far in excess of its capital stock—purporting to have been transferred to it by Bolinger's little bank, of itself pointed to Maple's extreme laxity and gross impropriety amounting to a breach of

trust even had the element of forgery been absent.

In February, 1928, Bolinger's situation was critical. He then told Maple that in order to get by the state bank examination he had represented to the examiner that his bank had a balance of $25,000 on deposit with Maple's bank; and that, though this was fictitious, he wished Maple would help him out and confirm this statement if a tracer were sent there. Maple said he would show in his bank a balance of $25,000 more than it was. This transaction alone indicates Maple's willingness dishonestly to involve his own bank for the purpose of helping Bolinger—if not for some other undisclosed motive.

In the spring of 1928. the Bolinger bank paper, genuine and spurious, held by appellee was about $150,000, and Maple's situation, as well as Bolinger's, was desperate. His directors were prodding him on account of these huge transactions with this little bank, and he expressed himself as fearful he would lose his place.

Under date of April 30, 1928, he wrote his assistant cashier saying: "There is always the chance that I may get bumped off, so I am writing you what I want done." He inclosed three letters, one for his father-in-law, one for his wife, and one for his board of directors, for delivery in case of his death, giving directions as to disposition of his property. Mention was made in one of the letters of the very large amount of this indebtedness and of his feeling of personal responsibility for it, and directing that certain of his life insurance be applied toward it. In a letter to Bolinger, of July 3, 1928, he referred to an impending crisis between him and his board. In another letter to Bolinger he said: "You have about got me backed up against the wall. Note after note past due but not paid. Over draft getting larger. Every promise you make me goes bad. * * * I do believe you should wake up to the real fact of what you and I are facing."

Things were becoming progressively worse, but in the face of all this Bolinger, who had given Maple the most indubitable evidence of his extreme desperation, and of his unworthiness of any further credit whatsoever, and of his readiness to resort to any means for raising money, was permitted to draw drafts of $5,000 on a far-distant bank and was given immediate credit therefor without any security. It may be that Bolinger expected the draft would be paid, but this is immaterial. He testified that in any event he had, by this means, use of this credit for the few intervening days.

To complete the picture, and as tending further to indicate Maple's then state of mind respecting Bolinger and his bank, it may be pointed out that on January 16, a short time after Maple had made a second unsuccessful attempt to put through the Baird draft, Maple was found in his bank dead, doubtless. through suicide, and $4,000 of his bank's funds missing, and that on the following day Bolinger's bank failed and shortly thereafter he was sent to the penitentiary.

True, many of these occurrences were prior to the issuance of appellant's bond. But such do not constitute the basis of recovery as to this item. Yet they well serve to manifest Maple's palpably wanton, reckless, and dishonest disregard for the interest of appellee in his dealings with Bolinger and his bank in the transactions occurring after appellant's bond was issued.

To warrant recovery under such a bond, the "dishonest act" of an employee, as mentioned in the bond, need not be such as would involve criminal liability of the employee for its commission. United States Fidelity & Guaranty Co. v. Bank of Thorsby, 46 F.(2d) 950 (C. C. A. 5); Citizens' Trust & Guaranty Co. of W. Va. v. Globe & Rutgers Fire Ins. Co., 229 F. 326, Ann. Cas. 1917C, 416 (C. C. A. 4); Aetna Casualty & Surety Co. v. Commercial State Bank, 13 F.(2d) 474 (D. C. Ill.); World Exchange Bank v. Commercial Casualty Ins. Co., 255 N. Y. 1, 173 N. E. 902; National Surety Co. v. Williams, 74 Fla. 446, 77 So. 212. If it indicates a reckless, willful, and wanton disregard for the interest of the employer—if it be an act manifestly unfair to the employer and palpably subjects him to likelihood of loss—a fact question of liability for loss thereby ensuing, as from a dishonest act, is fairly raised.

With this positive knowledge on Maple's part that Bolinger and his bank were wholly unworthy of credit for any amount whatever, in our judgment the evidence fairly raised a jury question as to whether Maple had acted honestly toward his bank in consenting, directly or indirectly, to this further credit to Bolinger or his bank. United States Fidelity & Guaranty Co. v. Bank of Thorsby, supra; World Exchange Bank v. Commercial Casualty Ins. Co., supra.

As to this item we are not at liberty to disturb the jury's verdict nor the judgment.

As to item third, $4,000, appellant con-

cedes that appellee is entitled to recover this, and there is no occasion for discussing it.

Item fourth, interest, is too large by the amount of interest on item one which entered into the judgment.

If within twenty-five days hereafter appellee shall file in the office of the clerk of this court certificate showing its remittitur from the judgment herein of the sum of $5,000 (item one) together with the interest thereon amounting to $625, which was included in the judgment (in all $5,625), the judgment will be affirmed for the balance thereof. If such remittitur be not so filed, the judgment will be reversed and the cause remanded for new trial.