RAVAL, INC., Plaintiff and Appellant, v. MARYLAND CASUALTY CO., Defendant and Appellee.

No. 585.        Decided January 29, 1964.

*Jorge L. Córdova, Jorge L. Córdova, Jr.,* and *Carlos Cebollero* for appellant. *Rivera Zayas, Rivera Cestero & Rúa* for appellee.

Division composed of Mr. Chief Justice Negrón Fernández, Mr. Justice Blanco Lugo, and Mr. Justice Ramírez Bages.

MR. JUSTICE BLANCO LUGO delivered the opinion of the Court.

The bond issued by Maryland Casualty Co. in favor of Raval, Inc., appellant herein, reads: ". . . agrees to indemnify RAVAL, INC. of BAYAMON, PUERTO RICO, hereinafter called Insured, against any loss of money or other property, real or personal (including that part of any inventory shortage which the Insured shall conclusively prove has been caused by the fraud or dishonesty of any Employee or Employees) belonging to the Insured, or in which the Insured has a pecuniary interest, or for which the Insured is legally liable, or held by the Insured in any capacity whether the Insured is legally liable therefor or not, which the Insured shall sustain and discover as provided in Section 2, the amount of indemnity on each of such Employees being TEN THOUSAND Dollars (10,000.00) *through any fraudulent or dishonest act or acts committed by any one or more of the Employees as defined in Section 3, acting alone or in collusion with others,* during the term of this bond as defined in Section 1."[1] The essential question

---

[1] Editor's Note: We omit this footnote as the English text of the bond is made part of the body of the opinion.

involved in this appeal is the determination of the scope and content in Puerto Rico of the concept of dishonesty in "fidelity insurance."[2]

## I

Three cardinal rules serve as a preface to the exploration we attempt: (1) in order that the act may be characterized as dishonest, it need not involve conduct punishable under the penal statutes; it need not partake of a criminal nature, *Fidelity & Deposit Co. of Maryland* v. *Bates*, 76 F.2d 160 (8th Cir. 1935); *London & Lancashire I. Co.* v. *People's Nat. Bank & Trust Co.*, 59 F.2d 149 (7th Cir. 1932); *Citizens' Trust & G. Co.* v. *Globe & Rutgers Fire Ins. Co.*, 229 Fed. 326 (4th Cir. 1915); *United States F. & G. Co.* v. *Egg Shippers S. & F. Co.*, 148 Fed. 353 (8th Cir. 1906.); (2) conduct may be dishonest even though the doer of the act does not personally profit by his action, *Mortgage Corp. of N.J.* v. *Aetna Casualty & Surety Co.*, 115 A.2d 43 (N.J. 1955); *Irvin Jacobs & Co.* v. *Fidelity & Deposit Co. of Maryland*, 202 F.2d 794 (7th Cir. 1953); *United States Fidelity & Guaranty Co.* v. *Bank of Thorsby*, 46 F.2d 950 (5th Cir. 1931); and (3) the determination of whether conduct is dishonest is essentially a question of fact, *Citizens' Acceptance Corp.* v. *New Amsterdam Casualty Co.*, 32 F.R.D. 600 (D.C. Del. 1963); *American Surety Co. of New York* v. *Shaw*, 54 F.2d 550 (5th Cir. 1932); or, as stated in *Home Indemnity Co.* v. *Reynolds & Co.*, 187 N.E.2d 274 (Ill. 1962), if reasonable men can differ respecting the characterization of the act, even within the wide scope of dishonesty, the question is for the jury. The accepted corollary of this latter proposition is that the position most favorable to the benefi-

---

[2] Section 4.090 of the Insurance Code of Puerto Rico, Act No. 77 of June 19, 1957, 26 L.P.R.A. § 409, provides that "surety insurance" includes "fidelity insurance, which is insurance guaranteeing the fidelity of persons holding positions of public or private trust."

ciary of the bond should prevail, and in that sense, that the concept of dishonesty must be broadly and comprehensively construed, *Reese Cadillac Corp.* v. *Glens Falls Ins. Co.*, 157 A.2d 331 (N.J. 1960); *Irvin Jacobs & Co.* v. *Fidelity & Deposit Co. of Maryland*, 202 F.2d 794 (7th Cir. 1953); *Brandon* v. *Holman*, 41 F.2d 586 (4th Cir. 1930). *Cf. American Surety Co.* v. *Pauly* (No. 1), 170 U.S. 133 (1898). See, in general, 9 Appleman, Insurance Law and Practice, §§ 5661–69.

■ ■ Limiting further the ambit of the investigation, we confront a series of generalizations employed by the courts under similar provisions in bonds guaranteeing against losses by fraud or dishonesty of employees to characterize certain conduct as dishonest or not. Indeed, a reading of the different decisions do not permit the formulation of steadfast rules on the matter. Their persuasive value rests almost entirely on an examination of the specific facts of each case. In *Home Indemnity Company* v. *Reynolds & Co.*, 187 N.E.2d 274 (Ill. 1962), some employees of the office of a stock exchange broker sold securities in express violation of the state law which prohibited transactions involving unregistered corporate securities. In denying the petition for summary judgment made by the insurance company, the court stressed the point that the employer had the right to expect its employees to comply honestly and faithfully with the duties of their positions, and added that their acts "were detrimental to the firm, disregarded its best interests and subjected it to heavy losses." However, in view of a statutory provision which defined as an offense the conduct of its employees which resulted in the loss, the foregoing language loses a great part of its impact. In *Reese Cadillac Corp.* v. *Glens Falls Ins. Co.*, 157 A.2d 331 (N.J. 1960), a loss resulted from an inventory shortage of tires in a department under the direction of a particular man who had alleged that the shortage would be wiped off upon receipt of cer-

tain credits from suppliers. Although the primary question discussed in the opinion is whether the inventory loss was conclusively established, as required by the bond contract, reference is made therein to certain principles on the scope of the concept of dishonesty, such as that evidence of mere negligence or incompetence does not constitute dishonesty, and that it is rather intended to cover certain acts which display a significant lack of probity, integrity or trustworthiness. The same view is held in *Jamestown Bridge Com'n* v. *American Employ. Ins. Co.*, 128 A.2d 550 (R.I. 1957), involving a claim based on the fact that an employee had received a sum in excess of his salary, and where it was said that the word dishonesty is not so broadly construed as to require indemnification for losses arising from casual conduct consisting of acts or omissions in the nature of mistakes, irregularities, carelessness or inefficiency, and that it is necessary to prove that the employee acted with an intent to wrongfully deprive his employer of its property. *Glens Falls Ind. Co.* v. *National Floor & Supply Co.*, 239 F.2d 412 (5th Cir. 1956), states that for an act to be dishonest within the meaning of a bond, moral turpitude or want of integrity must exist in acts which evince a want of integrity and an intentional breach of trust reposed in the employee. Thus, the court characterized as dishonest the acts of a warehouse manager who used funds of the enterprise for his personal use, made sales for cash without making out the necessary invoices or sales records, and delivered merchandise to a stranger without establishing credit background, because "a willful and flagrant violation to the detriment of the one who imposes the trust is an act of grave moral turpitude." In a much-discussed opinion delivered by the Supreme Court of New Jersey, *Mortgage Corp. of N.J.* v. *Aetna Casualty & Surety Co.*, 115 A.2d 43 (1955), it is held that the failure of an employee to inspect certain works covered by the duties of his position, thereby resulting in

certain losses to a bank, amounted to dishonesty. In the pertinent part it is stated at p. 48: "He deliberately failed to tell his employer that he was not making personal inspections because he was afraid he would lose his job; and this though he knew that the very purpose for which he was hired as inspector was to make personal inspections and to issue his certifications on the basis thereof. Under the admitted facts he palpably was faithless to his trust and deceived his employer; it matters not that his conscious deceptions may not have been accompanied by intent to cause actual monetary loss to his employer and may have been induced by motives of personal comfort or convenience rather than personal profit or gain for, in any event, his conduct was morally as well as legally wrongful." See Fields, *Bankers Blanket Bonds: What They Cover and What They Do Not*, 27 Ins. C.J. 318 (1960). In *Western Surety Co.* v. *May Mercantile Ass'n*, 283 P.2d 959 (Colo. 1955), in referring to an action of a manager of a corporation who informed the board of trustees on the existence of certain cash balances which in fact were fictitious, it is said that a dishonest act is one for wrongful purposes or moral obliquity. In *Irvin Jacobs & Co.* v. *Fidelity & Deposit Co. of Maryland*, 202 F.2d 794 (7th Cir. 1953), it is recognized that the mere negligence, mistake, error in judgment, or incompetence or inefficiency of an employee cannot be characterized as dishonest, but it is pointed out that the failure to follow established practices of the enterprise shows reckless disregard for the interests of the employer which evince a want of integrity and an intentional breach of trust. *Mortgage Brokerage Co.* v. *Mills*, 67 P.2d 68 (Colo. 1937), illustrates the principle that errors of judgment, without bad faith, do not constitute dishonesty, in disallowing a claim for losses sustained as a result of the unwarranted extension of credits secured by second mortgages when the excess was spent to clean up back taxes and similar items. A similar view is announced in *State* v. *Jay*,

10 N.E.2d 737 (Ind. 1937), where, in considering the payment of a check of a bank's president which was returned for insufficiency of funds and the overdraft paid by a personal note of the latter, it was said that the cashier's act did not amount to dishonesty, since the latter in its ordinary meaning includes an element of deceit or bad faith, and that such act of the employee evinced at the most an erroneous or injurious exercise of judgment. *Fidelity & Deposit Co. of Maryland* v. *Bates*, 76 F.2d 160 (8th Cir. 1935), adopts a more stringent view and includes within the characterization of dishonesty any willful omission of the duties of an office. In that case a bank employee knowingly permitted the overdrawing of an account and the drawing of checks on funds on deposit but not paid. In *London & Lancashire I. Co.* v. *People's Nat. Bank & Trust Co.*, 59 F.2d 149 (7th Cir. 1932), it is said that the positive knowledge of an employee that a certain client was unworthy of credit amounted to dishonesty because it indicated extreme laxity and impropriety toward the interests of the principal, since it subjected it unnecessarily to losses. In *American Surety Co. of New York* v. *Shaw*, 54 F.2d 550 (5th Cir. 1931), the conduct of an employee in permitting his brother-in-law to intervene in the affairs of a bank despite specific instructions to the contrary is characterized as dishonesty. See, also, *United States Fidelity & Guaranty Co.* v. *Barber*, 70 F.2d 220 (6th Cir. 1934); *United States Fidelity & Guaranty Co.* v. *Bank of Thorsby*, 46 F.2d 950 (5th Cir. 1931); *Andrew* v. *Hartford Accident & Indemnity Co.*, 223 N.W. 529 (Iowa 1929); and *United States F. & G. Co.* v. *Egg Shippers S. & F. Co.*, 148 Fed. 353 (8th Cir. 1906).

■ ■ The foregoing statement—illustrative of the nice distinctions elaborated even within the same jurisdiction in order to define the scope of the term dishonesty—leads us to consider the classical rule established by Mr. Justice Cardozo during his incumbency as Chief Justice of the Court of Ap-

peals of New York, in *World Exchange Bank* v. *Commercial Casualty Ins. Co.*, 173 N.E. 902 (1930). The facts involved are simple. Katz opened a current account in World Exchange Bank in which he deposited a number of checks and drafts, some genuine, some forged. The checks, when forged, were drawn on banks in the West and the drafts were drawn on an enterprise which was merely a trade name for the drawer himself. The bank's rules prohibited payment of checks drawn by a client on uncollected deposits except with the consent of the president or other officer. During the period in which the fictitious checks were in process of collection, Katz drew checks on the account, handed them to the paying teller and received the cash. The teller paid them believing them to be good, but mindful of the fact that they were drawn against uncollected funds. On the first occasion he received the approval of the president before paying out the money. On the other occasions he failed to do so. As a result the bank sustained a loss of $22,824.50 when the fictitious checks were returned for lack of funds. The bank maintained that the teller had committed a dishonest act, under the terms of the bond, in paying without first procuring the approval of an authorized officer. The opinion reads: "We think the quality of the act is not so obvious and determinate as to exclude opposing inferences. [Citations.] Criminal the act was not, unless done with criminal intent. [Citations.] The presence of that intent is not, in the setting of these circumstances, an inference of law. The question is perhaps closer whether the act within the meaning of the policy must be said to be 'dishonest,' for dishonesty within such a contract may be something short of criminality. [Citations.] *The appeal is to the mores rather than to the statutes.* Dishonesty, unlike embezzlement or larceny, is not a term of art. Even so, the measure of its meaning is not a standard of perfection, but an infirmity of purpose so opprobrious or furtive as to be fairly characterized as dishonest *in the common speech of*

*men."* Indeed, the light shed by this opinion remands the problem to us in all its essence, for it places on our shoulders —in the absence of jury in civil actions—the determination of what, according to the uses and customs in our community, constitutes a dishonest act. We must face this determination with the evident risk that perhaps we judges are in no better position to determine the *public* scope of the concept of "dishonesty" as distinct from "illegality." As has been stated in commenting on the rules laid down by Mr. Justice Cardozo, "measuring mores is not within the peculiar competence of the judicial temperament." *Citizens' Acceptance Corp.* v. *New Amsterdam Casualty Co.,* 32 F.R.D. 600, 604 (1963).

## II

The facts which give rise to appellant's claim for recovery of the loss sustained as a result of "dishonest" acts of two employees—the company's liability is $10,000 for each employee—appear from the sworn statement of I... C..., which was admitted in evidence, and from the oral testimony given by F... B... at the trial. We must first note that the respondent company accepted its responsibility for the acts of the former, but it maintains that the conduct observed by F... B... does not amount to "dishonesty" under the terms of the bond, and that the alleged embezzlement was not the act of two employees "acting jointly," as alleged in the complaint. It was also stipulated that B... did not receive any part of the sum embezzled, and that C... alone converted all the amounts to himself.

C... started to render services to appellant Raval, Inc., early in March 1952, as a shipping clerk. He was afterwards designated accountant and office manager of the firm. Among his duties, C... received the cash payments and checks for the cash sales, as well as the amounts for credit to customers to whom credit had been extended. In the performance of

these duties he prepared the bank deposit sheets, made the corresponding accounting entries of the money received and the entries for credit to different accounts, reconciled the monthly statements sent by the bank, and in general "he was in charge of the firm's entire accounting." Since 1956 he started to embezzle the cash received for the cash sales or for credit to accounts receivable.[3] In order to cover the embezzled funds, in the case of credits he did not enter the credit to the customer until the checks for credit to other accounts were received, "thereby replacing with the latter the money taken," as a result of which the amounts unduly taken kept increasing and, consequently, the corresponding credits in the accounts receivable were not made. The situation became critical early in 1959 when the sales in the local market were discontinued, as a result of which the movement in the accounts receivable was reduced. Finally, four months before the embezzlement was discovered he prepared a check every month on a nonexistent account to cover the embezzled sums and to justify the credits which he entered in the accounts of the customers, which check was returned by the bank with a debit note that C ... destroyed. He continued making the same operation until September 1959 when the embezzlement was discovered and he could not destroy the fictitious check for the sum of $15,203. It was stipulated that C ... prepared two deposit sheets for the bank, one of which corresponded to the entries in the books and the other to the deposits made.

B ... worked for Raval, Inc., from 1952 until the first week of July 1958 mostly in the preparation of the payrolls and he also kept certain books. The entries in the accounts receivable "were made by him [C ...] and he turned them over to me, or I made them myself, depending on how it was." Most of the times he prepared the deposit sheets "upon in-

---

[3] It was stipulated at the hearing that C ... also converted to his use checks which were not drawn in the name of Raval, Inc., but which were endorsed by customers in favor of the latter.

structions of Mr. C . . .," who went over the checks and ordered him to make the deposits. B . . ., a man of scant preparation for the duties which he performed—had pursued studies up to the first year of high school and was not a bookkeeper—realized that there was something wrong with the accounts, "something that does not fit into one's circumstances," since "I had difficulty in balancing certain accounts, and when it failed to balance I said, 'it never comes out equal,' and he fixed it for me. Two deposit sheets were prepared, one for the bank and the other was kept by C . . ., which operation smelled fishy to B . . . ." He repeated that "I realized that there was something wrong, but since it was no concern of mine . . . ." The following part of his testimony is most significant:

"Q. Did you know that he was doing something wrong because you realized it?

A. It did not balance and I realized that.

Q. Realized what?

A. That it did not balance and I found numbers which did not correspond to the card file, and it did not balance and I had trouble with some customers.

Q. Did you know why it did not balance?

A. He would work on that.

Q. It did not balance because you were making copies of fictitious deposits upon instruction of C . . . . Is that correct?

A. Apparently.

Q. Is that correct or is it not?

A. Yes, yes."

He was not surprised by the news of the embezzlement of C . . ., and when he came across the latter and he said to me "that they had found out about him," he answered, "some time they had to find out," and added that "it had to come out some time." He spoke with Seigel, manager of the firm, who said to him that he could have told him (Seigel) about what he had observed, and "I answered . . . that I was an employee and that if I told him that C . . . was doing some-

thing which I thought was improper, he would fire me, and I told him that I did as he told me."

In view of this set of facts, was B's . . . conduct dishonest? Despite his natural reticence on the witness stand for fear of saying something which could complicate him in manipulations from which he did not derive any benefit, it is clear that B . . . knew that his immediate superior was performing acts which were prejudicial to the enterprise, although possibly he did not realize fully the artifice which he was using. He also had full knowledge that he was an instrument of C's . . . machinations. His knowledge went beyond mere suspicions. Yet, he chose to act exclusively for his personal convenience—prevent being removed from his job by C . . .—and by his silence he placed his employer in the position of sustaining a substantial loss. The least that may be said is that he was disloyal and unmindful of the duties toward his employer, thereby showing infirmity of purpose and violating the trust reposed in him. This being so, we have no doubt that in the opinion of the community the conduct of B . . . may be justly characterized as dishonest.

That seems to be also the trend of the decisions. In *National Surety Co.* v. *Julian*, 150 So. 474 (Ala. 1933), claim was made by the receiver of a corporation which had sustained losses as a result of acts of its president, its general manager, and its bookkeeper. Although no reference is specifically made in the text of the opinion to the individual actions, it is significant that in summing up the conclusions on the surety's liability the court says that the corporation was ruined by the criminal conduct of its president, aided by the connivance of the bookkeeper in manipulating the books of the company, and by the manager "in permitting the wrongs *with knowledge thereof*." *Fiala* v. *Ainsworth*, 88 N.W. 135 (1901), considers the question of the duty of an assistant cashier of a bank to inform the directors on the embezzlement of funds by the cashier, concluding that the

concealment of such fact amounted to a violation of the duties of his office which imposed liability under the terms of a bond guaranteeing the faithful and honest discharge of his duties. Although decided under bonds which did not refer specifically to dishonesty of employees, see *Shaw* v. *Cone*, 56 S.W.2d 667 (Texas 1933); *Austin* v. *Neiman*, 14 S.W.2d 794 (Texas 1929); *American Surety* v. *Austin*, 5 S.W.2d 626 (Texas 1928), particularly *National Surety Co.* v. *First State Bank*, 244 S.W. 217 (Texas 1922), in which it is held that where subordinate employees and officers of a bank not only had knowledge of the vice president's abstractions but aided and assisted therein by concealing what they knew, by false entries on the books, they were guilty of willful misapplication of funds, if not of embezzlement or appropriation.

■ Having established the liability of the respondent company for the acts of employee F . . . B . . ., there remains to consider the evidence presented in order to determine the amount of the loss attributable to the latter's actions. Claim was made in the complaint for the sum of $19,401.18. At the preliminary hearing it was only accepted that the loss sustained amounted to that sum, wherefore plaintiff was bound to establish that the same was the result of the actions of I . . . C . . . and F . . . B . . ., for which there was offered, among others, a report prepared by the accounting firm Pol, Toro & Co. comprising a statement of the amounts appropriated during the period comprised between June 30, 1957 and June 30, 1959, specifying the date of each appropriation and other items. It seems clear that the latter items are not covered by the bond, wherefore the following items should be eliminated: loan to C . . . $29.85, and charged to the personal account of employee C . . . $101.06.[4] The claim is reduced to $19,270.27.

---

[4] Upon questioning by the court, it was so admitted at the hearing by the representative for appellant.

However, the evidence establishes beyond any doubt that F . . . B . . . ceased to render services to Raval, Inc., in the first week of July 1958. He cannot therefore be held liable for the appropriations made by C . . . as of that date, amounting to $9,558.65.[4] On the other hand, according to the evidence presented the first appropriation which gave rise to a loss in which B . . . intervened and to which reference has been made took place on January 22, 1958.[5] There is no competent evidence to conclude that B . . . aided passively in the appropriations prior to that date amounting to $2,499.83. Although the deposit sheets corresponding to January 31, 1958 were presented, the item of $77.50 of customer Zoraida Rivera was not established either. Summing up, the company's liability for the acts of B . . . amounts to $7,144.29 only.

### III

The second error refers to the failure of the trial court to include a pronouncement on the payment of interest. On April 5, 1960, accountant Manuel Toro Aquiles, in the name of appellant, wrote a letter to appellee enclosing a statement of the amounts abstracted totalling $19,401.18, which afterwards served as a basis for the formulation of the complaint. The following day the insurance company accepted liability for the acts of employee I. . . C. . . offering to pay the sum of $10,000. The same position was taken in alleging against the complaint, but it was not until August 28, 1961, after judgment had been rendered, that the said sum was paid.

Although there are decisions to hold that the starting point for commencement of the obligation to pay interest is from the date of the breach which gives rise to the loss recoverable under the fidelity policy, the rule most widely

---

[4] Upon questioning by the court, it was so admitted at the hearing by the representative for appellant.

[5] Item of $457.50 of customer Justino Reyes.

accepted and which seems more reasonable is that which fixes the commencement from the date notice of the loss is given to the surety company or from demand to make good such obligation, *Prior Lake State Bank* v. *National Surety Corp.*, 80 N.W.2d 612 (Minn. 1957), whether such insurance guarantees the fidelity of persons holding positions of public as well as of private trust. *American Casualty Co.* v. *Texas Real Estate Com'n*, 362 S.W.2d 192 (Texas 1962) ; *Employers Liability Assurance Corp., Ltd.* v. *Lewis*, 115 S.E.2d 387 (Ga. 1960) ; *Keen* v. *Lewis*, 109 S.E.2d 764 (Ga. 1959) ; Annotation, *Time from which interest begins to run on fidelity or public officers bond*, 57 A.L.R.2d 1317 (1958). The judgment will therefore be modified so as to allow interest to appellant on the sum of $10,000 from April 5, 1960 to August 28, 1961, and on the sum of $7,144.29 from April 5, 1960 to the day payment is tendered.

Judgment will be rendered accordingly.