RAVAL, INC., demandante y recurrente, *v.* MARYLAND CASUALTY Co., demandada y recurrida.

*Número:* 585 *Resuelto:* 29 de enero de 1964

*Jorge L. Córdova, Jorge L. Córdova, Jr., y Carlos Cebollero,* abogados de la recurrente; *Rivera Zayas, Rivera Cestero & Rúa,* abogados de la recurrida.

Sala integrada por el Juez Presidente Señor Negrón Fernández y los Jueces Asociados Señores Blanco Lugo y Ramírez Bages.

EL JUEZ ASOCIADO SEÑOR BLANCO LUGO emitió la opinión del Tribunal.

Reza la fianza expedida por Maryland Casualty Co. a favor de la recurrente Raval, Inc.: "indemnizará a Raval, Inc. de Bayamón, Puerto Rico, a quien en adelante se denominará la Asegurada, contra toda pérdida de dinero u otra propiedad, inmueble o mueble (incluyendo cualquier merma en inventarios que la Asegurada establezca en forma concluyente haber sido causada por fraude o deshonestidad de cualquier Empleado o Empleados) perteneciente a la Asegurada, o en la cual ésta tuviere un interés pecuniario, o por la cual la Asegurada tuviere legalmente que responder, o que poseyere en cualquier capacidad, sea o no la Asegurada responsable por la misma, cuya pérdida se sufra o descubra según provisto en la Sección 2, hasta la suma de Diez Mil Dólares ($10,000), *por cualquier acto de fraude o deshonestidad cometido por uno o más empleados* según se definen en la Sección 3, *actuando individualmente o en colusión con otros,* durante el período de vigencia de esta fianza según se define en la Sección 1." (¹) La cuestión medular envuelta en este recurso es

---

(¹) El texto en inglés de la cláusula lee así:
". . . agrees to indemnify RAVAL, INC. of BAYAMON, PUERTO RICO hereinafter called Insured, against any loss of money or other property, real or personal (including that part of any inventory shortage which the Insured shall conclusively prove has been caused by the fraud or dishonesty of any Employee or Employees) belonging to the Insured, or in which the Insured has a pecuniary interest, or for which the Insured is

determinar el alcance y contenido en Puerto Rico del concepto de deshonestidad en un "seguro de fidelidad". (²)

## I

Tres normas cardinales nos sirven de prólogo a la exploración que intentamos: 1—Para que el acto pueda considerarse como deshonesto no es indispensable que se trate de conducta punible bajo los estatutos penales; no es necesario que participe de naturaleza criminal, *Fidelity & Deposit Co. of Maryland* v. *Bates*, 76 F.2d 160 (8th Cir. 1935) ; *London & Lancashire I. Co.* v. *People's Nat. Bank & Trust Co.*, 59 F.2d 149 (7th Cir. 1932) ; *Citizens Trust & G. Co.* v. *Glove & Rutgers Fire Ins. Co.*, 229 Fed. 326 (4th Cir. 1915) ; *United States F. & G. Co.* v. *Egg Shippers S. & F. Co.*, 148 Fed. 353 (8th Cir. 1906) ; 2—Puede incurrirse en conducta deshonesta aun cuando el autor del acto no se haya beneficiado pecuniariamente de su actuación personal, *Mortgage Corp. of N.J.* v. *Aetna Casualty & Surety Co.*, 115 A.2d 43 (N.J. 1955) ; *Irvin Jacobs & Co.* v. *Fidelity & Deposit Co. of Maryland*, 202 F.2d 794 (7th Cir. 1953) ; *United States Fidelity & Guaranty Co.* v. *Bank of Thorsby*, 46 F.2d 950 (5th Cir. 1931) ; y, 3—La determinación de si la conducta es deshonesta constituye esencialmente una cuestión de hecho, *Citizens Acceptance Corp.* v. *New Amsterdam Casualty Co.*, 32 F.R.D. 600 (D.C. Del. 1963) ; *American Surety Co. of New York* v. *Shaw*, 54 F.2d 550 (5th Cir. 1932), o como se indicó en *Home*

legally liable, or held by the Insured in any capacity whether the Insured is legally liable therefor or not, which the Insured shall sustain and discover as provided in Section 2, the amount of indemnity on each of such Employees being TEN THOUSAND Dollars (10,000.00) *through any fraudulent or dishonest act or acts committed by any one or more of the Employees as defined in Section 3, acting alone or in collusion with others,* during the term of this bond as defined in Section 1."

(²) El Art. 4.090 del Código de Seguros de Puerto Rico, Ley Núm. 77 de 19 de junio de 1957, 26 L.P.R.A. sec. 409, señala que el "seguro de garantía" incluye el "seguro de fidelidad, que garantiza la probidad de personas que ocupan puestos públicos o privados de confianza."

*Indemnity Co.* v. *Reynolds & Co.*, 187 N.E.2d 274 (Ill. 1962), si personas razonables pueden diferir respecto a la calificación del acto, aun dentro de un concepto amplio de deshonestidad, la cuestión es para el jurado. Corolario aceptado de esta última proposición es que debe prevalecer la posición más favorable al beneficiario de la fianza, y en ese sentido, que al concepto deshonestidad debe extendérsele la interpretación más amplia y comprensiva, *Reese Cadillac Corp.* v. *Glens Falls Ins. Co.*, 157 A.2d 331 (N.J. 1960); *Irvin Jacobs & Co.* v. *Fidelity & Deposit Co. of Maryland*, 202 F.2d 794 (7th Cir. 1953); *Brandon* v. *Holman*, 41 F.2d 586 (4th Cir. 1930). Cf. *American Surety Co.* v. *Pauly*, (No. 1) 170 U.S. 133 (1898). En general, véase, Appleman, *Insurance Law and Practice*, Vol. 9, secs. 5661 a 5669.

 Limitando un poco más el ámbito de la investigación nos enfrentamos a una serie de generalizaciones que los tribunales han utilizado bajo disposiciones similares en fianzas que garantizan contra pérdidas por fraude o deshonestidad de empleados para caracterizar determinada conducta como deshonesta o no. Ciertamente una lectura de las distintas decisiones no nos permite formular normas precisas sobre el particular. Su valor persuasivo descansa casi enteramente en un examen de los hechos específicos de cada caso. En *Home Indemnity Company* v. *Reynolds & Co.*, 187 N.E.2d 274 (Ill. 1962), unos empleados de la oficina de un corredor de bolsa vendieron valores en violación expresa de la ley del estado que prohibía transacciones respecto a acciones de corporaciones que no se hubieren registrado localmente. Al denegar una solicitud de sentencia sumaria presentada por la compañía aseguradora, el tribunal dio énfasis a que el patrono tenía derecho a esperar que sus empleados cumplieran las obligaciones de sus cargos con honestidad y fidelidad, y añadió que los actos de éstos "fueron perjudiciales a la empresa, desconocieron los mejores intereses de ésta y la expusieron a sufrir pérdidas cuantiosas." Sin embargo, ante una disposición esta-

tutaria que definía como delito la conducta observada por los empleados que dio margen a la pérdida, el anterior lenguaje pierde gran parte de su impacto. En *Reese Cadillac Corp.* v. *Glens Falls Ins. Co.*, 157 A.2d 331 (N.J. 1960), ocurrió una pérdida en el inventario de neumáticos de la demandante cuya dirección había sido encomendada a un determinado empleado, y quien había alegado que la merma se enjugaría al recibirse ciertos créditos de suplidores. Aunque en la opinión se discute principalmente si la pérdida en el inventario se estableció en forma concluyente, tal cual exigido por el contrato de fianza, en ella se hace referencia a ciertos principios sobre el alcance del concepto deshonestidad, tales como que la evidencia de mera negligencia o incompetencia no constituye deshonestidad, y que más bien lo que se intenta cubrir son actos que señalan una apreciable falta de probidad, integridad o confiabilidad. En igual sentido se manifiesta *Jamestown Bridge Com'n* v. *American Employ. Ins. Co.*, 128 A.2d 550 (R.I. 1957), en que se trataba de una reclamación fundada en que un empleado había percibido un salario en exceso de lo que le correspondía, y donde se dijo que irrespectivamente de la interpretación amplia que debe atribuirse al término deshonestidad, ello no autoriza a indemnizar por pérdidas ocasionadas por conducta casual consistente en actos u omisiones que constituyan equivocaciones, irregularidades, descuidos o ineficiencia, y que se requiere que se establezca que la actuación del empleado respondió al propósito ilegal de privar al patrono de su propiedad. *Glens Falls Ind. Co.* v. *National Floor & Supply Co.*, 239 F.2d 412 (5th Cir. 1956), expresa que para que un acto se considere deshonesto bajo los términos de una fianza debe estar presente el elemento de torpeza moral o falta de integridad consistente en conducta que evidencie falta de integridad y un quebrantamiento deliberado de la confianza depositada en el empleado. Así, el tribunal calificó como deshonestas las actuaciones del encargado de un almacén que usó fondos de la empresa para su

propio beneficio, efectuó ventas de contado sin expedir las correspondientes facturas o hacer los asientos necesarios en los récords y entregó mercancía a un extraño sin exigir ni comprobar la indispensable información de crédito, porque "una violación deliberada y flagrante en perjuicio de la persona que ha depositado la confianza es un acto grave de torpeza moral." En una discutida opinión emitida por la Corte Suprema de Nueva Jersey, *Mortgage Corp. of N.J.* v. *Aetna Casualty & Surety Co.*, 115 A.2d 43 (1955), se sostiene que la omisión de un empleado de inspeccionar ciertas obras que le imponía los deberes de su cargo, ocasionando con ello ciertas pérdidas a un banco, constituía deshonestidad. En la parte pertinente, a la pág. 48, se dice: "Porque temía perder su empleo, deliberadamente omitió informar a su principal que no estaba haciendo las inspecciones personales, y esto, a pesar de que sabía que el propósito único para el cual se le había contratado como inspector era para realizar tales inspecciones y expedir las certificaciones correspondientes. Bajo los hechos admitidos fue palmariamente infiel a la confianza en él depositada y engañó a su patrono; sin que importe que estos engaños intencionados no respondieran al deseo de causar una pérdida pecuniaria a su principal, sino por motivos de comodidad y conveniencia personal, aunque no de lucro para sí, porque, en cualquier caso, su conducta fue moral y legalmente errónea." Véase, Fields, *Bankers Blanket Bonds: What They Cover and What They Do Not*, 27 Ins. C.J. 318 (1960). En *Western Surety Co.* v. *May Mercantile Ass'n*, 283 P.2d 959 (Colo. 1955), al referirse a la actuación de un gerente de una corporación que informó a la junta de directores sobre la existencia de unos balances en efectivo que en realidad eran ficticios, se expresa que un acto deshonesto es aquél dirigido al logro de un propósito ilegal o que revela un extravío o aberración moral. En *Irvin Jacobs & Co.* v. *Fidelity & Deposit Co. of Maryland*, 202 F.2d 794 (7th Cir. 1953), se reconoce que la mera negligencia, equivocación o error de

juicio no se considera usualmente como deshonestidad, así como los actos que resultan de la incompetencia o ineficiencia de un empleado, pero se señala que la omisión de seguir prácticas establecidas por la empresa demuestra una desatención desconsiderada hacia los intereses del patrono que evidencia falta de integridad y un quebrantamiento deliberado de la confianza. *Mortgage Brokerage Co.* v. *Mills*, 67 P.2d 68 (Colo. 1937), ilustra el principio de que los errores de juicio, de buena fe, no constituyen deshonestidad, al denegar una reclamación por pérdidas sufridas con motivo de la extensión de créditos garantizados por segundas hipotecas que no se justificaba, cuando el exceso se invirtió para pagar contribuciones que se adeudaban y otros cargos similares. En forma similar se pronuncia *State* v. *Jay*, 10 N.E.2d 737 (Ind. 1937), en donde al considerar el pago de un cheque del presidente de un banco que fue devuelto por insuficiencia de fondos y cubierto el sobregiro mediante la expedición de una obligación personal de éste, se dijo que la conducta del cajero no constituía deshonestidad, ya que ésta en su significado corriente incluye un elemento de engaño o mala fe, y la actuación del referido empleado a lo sumo evidenciaba un ejercicio imprudente o indiscreto de juicio. *Fidelity & Deposit Co. of Maryland* v. *Bates*, 76 F.2d 160 (8th Cir. 1935), adopta una posición más estricta y comprende dentro de la calificación de deshonesto cualquier incumplimiento voluntario de las obligaciones de un cargo. Tratábase de un empleado de un banco que, a sabiendas, permitió sobregiros en una cuenta y que se expidieran cheques contra fondos depositados pero incobrados. En *London & Lancashire I. Co.* v. *Peoples Nat. Bank & Trust Co.*, 59 F.2d 149 (7th Cir. 1932), se señala que el conocimiento positivo de un empleado de que determinado cliente no era merecedor de crédito constituía deshonestidad porque ello indicaba desconsideración e indiferencia irreflexiva para los intereses del principal, pues les exponía innecesariamente a pérdidas. En *American Surety Co. of New York* v. *Shaw*,

54 F.2d 550 (5th Cir. 1931), se caracteriza como deshonesti-
dad la conducta de un empleado que permitió a su cuñado
intervenir en los asuntos de un banco a pesar de que tenía
instrucciones específicas en contrario. Pueden verse además,
*United States Fidelity & Guaranty Co.* v. *Barber*, 70 F.2d 220
(6th Cir. 1934); *United States Fidelity & Guaranty Co.* v.
*Bank of Thorsby*, 46 F.2d 950 (5th Cir. 1931); *Andrew* v.
*Hartford Accident & Indemnity Co.*, 223 N.W. 529 (Iowa
1929); y *United States F. & G. Co.* v. *Egg Shippers S. & F.
Co.*, 148 Fed. 353 (8th Cir. 1906).

La relación precedente—ilustrativa de las finas dis-
tinciones que se han elaborado aun dentro de una misma juris-
dicción para definir el alcance del concepto de deshonestidad—
nos lleva a considerar la norma clásica establecida por el Juez
Cardozo, mientras presidía la Corte de Apelaciones de Nueva
York, en *World Exchange Bank* v. *Commercial Casualty Ins.
Co.*, 173 N.E. 902 (1930). Sencillos son los hechos envueltos.
Katz abrió una cuenta corriente en el World Exchange Bank
en la cual depositó cierto número de cheques y giros, algunos
legítimos, otros falsificados. Los cheques falsificados se ex-
pidieron contra bancos situados en el Oeste y los giros se
libraron contra una empresa que era un nombre comercial
que utilizaba el propio librador. Las reglas del banco no
permitían que se pagaran los cheques de un cliente contra de-
pósitos no cobrados, a menos que para ello se obtuviera el con-
sentimiento del presidente u otro oficial. En el período en
que los cheques ficticios estaban en proceso de cobro, Katz
expidió cheques contra la cuenta que entregó a un pagador,
recibiendo efectivo a cambio. El pagador actuó bajo la creen-
cia de que eran genuinos pero advertido del hecho de que los
fondos contra los cuales se giraba no habían sido cobrados.
En la primera ocasión gestionó la aprobación del presidente
antes de proceder al pago. En las otras ocasiones omitió
hacerlo. Como resultado de ello el banco sufrió una pérdida

de $22,824.50, al devolverse los cheques espurios por falta de fondos. El banco sostuvo que el pagador había incurrido en un acto deshonesto, bajo los términos de la fianza, al verificar el pago sin obtener la aprobación previa de un oficial autorizado. Dice la opinión: "No creemos que la categoría del acto es tan obvia y determinada como para excluir inferencias contradictorias (citas). La conducta observada no fue de naturaleza criminal, a menos que se realizara con intención criminal (citas). Bajo las circunstancias concurrentes no puede afirmarse, como inferencia de derecho, que existe tal intención. Más bien se trata de si puede decirse que bajo los términos de la póliza la actuación fue deshonesta, ya que la deshonestidad dentro de tal contrato puede no envolver conducta criminal (casos). *La encuesta se dirige más a los usos y costumbres que a los estatutos.* La deshonestidad, contrario al abuso de confianza y al hurto, no es un término con un significado definido en la ciencia del Derecho. Aun así, el alcance de su significado no entraña una norma de perfección, sino una inconstancia de propósitos tan reprochable u oculta que pueda razonablemente calificarse como deshonesta *en el lenguaje común.*" En verdad la luz que arroja esta opinión nos devuelve el problema en toda su esencia, pues coloca sobre nuestros hombros—en ausencia de jurado en los pleitos civiles—la determinación de lo que, conforme a los usos y costumbres en nuestra comunidad, constituye un acto deshonesto. Esta determinación debemos afrontarla con el riesgo evidente de que quizás no estemos los jueces en la mejor posición para determinar el alcance *público* del concepto de "deshonestidad" en contradistinción al de "ilegalidad". Como se ha expresado al comentar sobre las normas sentadas por el Juez Cardozo, "No es de la peculiar competencia del temperamento judicial la determinación de lo que constituye los usos tradicionales de la comunidad." *Citizen's Acceptance Corp.* v. *New Amsterdam Casualty Co.,* 32 F.R.D. 600, 604 (1963).

## II

Los hechos que dan margen a la reclamación de la recurrente para resarcirse de la pérdida sufrida con motivo de los actos "deshonestos" de dos empleados—la responsabilidad de la compañía es de $10,000 por cada empleado—surgen de la declaración jurada de I. . . C. . ., que fue admitida en evidencia, y del testimonio oral prestado por F. . . B. . . en el acto del juicio. Antes es preciso advertir que la compañía recurrida aceptó su responsabilidad por los actos cometidos por el primero, pero que sostiene que la conducta observada por F. . . B. . . no constituye "deshonestidad" bajo los términos de la fianza y que la malversación alegada no fue obra de dos empleados "actuando conjuntamente" según alegado en la demanda. También se estipuló que B. . . no recibió parte alguna de la suma malversada y que todas las cantidades se las apropió C. . . exclusivamente.

C. . . comenzó a prestar servicios a la recurrente Raval, Inc. a principios de marzo de 1952 como empleado encargado de los embarques. Luego se le designó contador y gerente de la oficina de la firma. Entre sus deberes, C. . . recibía los pagos en efectivo y cheques de las ventas al contado así como las cantidades para ser acreditadas a clientes a quienes se les había extendido crédito. En estos menesteres preparaba las hojas de depósitos bancarios, efectuaba los asientos de contabilidad correspondientes para ingresar el dinero recibido y hacer las entradas para acreditar a las distintas cuentas, reconciliaba los estados mensuales remitidos por el banco, y en general "tenía a [su] cargo toda la contabilidad de la firma." Desde el año 1956 comenzó a distraer el efectivo que recibía por las ventas de contado o para abonar a las cuentas a cobrar.(³) Para cubrir la malversación, cuando se trataba de abonos no verificaba el crédito al cliente hasta no recibir

---

(³) En el acto de la vista se estipuló que C. . . además se apropiaba de cheques que no estaban expedidos a nombre de Raval, Inc. sino endosados por clientes a favor de ésta.

cheques para ser acreditados a otras cuentas, "sustituyendo en esta forma con los últimos el dinero tomado," resultando que las cantidades tomadas indebidamente aumentaron y, por consiguiente, se omitieron los abonos correspondientes en las cuentas a cobrar. La situación hizo crisis a principios de 1959 al eliminarse las ventas en plaza, lo que ocasionó que se redujera el movimiento en las cuentas a cobrar. Finalmente, desde cuatro meses antes de descubrirse el desfalco, preparaba mensualmente un cheque contra una cuenta inexistente para cubrir las sumas malversadas y justificar los créditos que asentaba en las cuentas de los clientes, cuyo cheque era devuelto por el banco con una nota de débito que C. . . destruía. Continuó haciendo la misma operación hasta septiembre de 1959 en que se descubrió el desfalco y no pudo destruir el cheque falso por la suma de $15,203.00. Se estipuló que C. . . preparaba dos hojas de depósito para el banco, una que correspondía con las entradas en los libros y otra con el depósito que se hacía.

B. . . trabajó para Raval, Inc. desde 1952 hasta la primera semana de julio del año 1958 principalmente en la preparación de las nóminas y, además, llevaba ciertos libros. Las entradas en las cuentas a cobrar "las hacía él [C. . .] y me las pasaba a mí, o las hacía yo, dependiendo de cómo fuera." En la mayoría de los casos preparaba las hojas de depósito "a través de las instrucciones del señor C. . .," quien revisaba los cheques y le ordenaba hacer los depósitos. B. . ., hombre de escasa preparación para los menesteres que realizaba—había cursado estudios hasta primer año de escuela superior y no era tenedor de libros—captaba que había cierta anormalidad en relación con las cuentas, "algo que no está dentro de las circunstancias de uno," pues "tenía dificultad en cuadrar ciertas cuentas, y al no cuadrar decía 'no me cuadra nunca' y él lo arreglaba." Se preparaban dos hojas de depósito, una que se llevaba al banco, y la otra era conservada por C. . ., operación que a B. . . le olía mal.

Repitió que "me daba cuenta de algo, que algo ocurría, pero como no era cosa de mi incumbencia . . ." Significativo en extremo es la siguiente parte de su testimonio:

"P ¿Usted sabía que estaba haciendo algo malo porque usted captó eso?

R No me cuadraba y me daba cuenta de eso.

P ¿Cuenta de qué?

R Que no me cuadraba y encontraba números que no entraban cuando iba a coger el tarjetero y no me cuadraba y tenía dificultad con algún cliente.

P ¿Usted sabía por qué no le cuadraba?

R El se ponía a trabajar en eso.

P No le cuadraba porque usted estaba haciendo copias de depósitos falsas por instrucciones de C. . . ¿Es así?

R Aparentemente.

P ¿Es así o no es así?

R Sí, sí.

No le sorprendió la noticia sobre el desfalco de C. . ., y cuando se encontró con éste y me dijo "que le habían descubierto lo de él," le contestó: "algún día tenía que aparecer eso," y añadió que "eso algún día tenía que explotar." Se entrevistó con el señor Seigel, gerente de la firma, que le indicó que él podía haberle relatado lo que había observado, y "le contesté . . . que yo era un empleado y si le iba a decir que C. . . estaba haciendo algo que yo veía impropio me botaba y yo le dije que yo hacía lo que él me mandaba."

■ Frente al cuadro de hechos expuesto, ¿incurrió B. . . en conducta deshonesta? A pesar de su natural reticencia en la silla de testigos ante el temor de decir algo que pudiera complicarle en manejos de los cuales no derivó provecho alguno, parece claro que B. . . tenía conocimiento de que su superior inmediato estaba realizando actos perjudiciales para la empresa, aunque posiblemente no comprendiera en toda su extensión el ardid que para ello utilizaba. También tenía pleno conocimiento de que era un instrumento en las

maquinaciones de C. . . Su conocimiento trascendió de meras sospechas. Sin embargo, prefirió responder exclusivamente a su propia conveniencia personal—evitar que se le separara del cargo por C. . .—y con su silencio colocó a su principal en la posición de sufrir una pérdida cuantiosa. Lo menos que puede decirse es que fue desleal y desatento a los deberes que tenía para con su patrono, revelando así infirmeza de propósitos y atentando contra la confianza en él depositada. Siendo ello así, no tenemos duda de que en el concepto de la comunidad, la conducta de B. . . puede justamente calificarse de deshonesta.

Así parece ser también la inclinación de la jurisprudencia. En *National Surety Co.* v. *Julian*, 150 So. 474 (Ala. 1933), se trataba de una reclamación formulada por el liquidador de una corporación que había sufrido pérdidas con motivo de los actos de su presidente, su administrador general y su interventor de cuentas. Aunque no se hace referencia específica en el texto de la opinión a las actuaciones individuales, es significativo que al resumir la conclusión sobre la responsabilidad de la fiadora, el tribunal manifiesta que la corporación fue arruinada por la conducta criminal del presidente, ayudado por la connivencia del interventor mediante la manipulación de los libros de la compañía, y por el administrador "al permitir la realización de los actos condenables *teniendo conocimiento de los mismos.*" *Fiala* v. *Ainsworth*, 88 N.W. 135 (1901), considera la cuestión del deber de un asistente del cajero de un banco de informar a los directores sobre la malversación de fondos por el cajero, concluyéndose que la ocultación de tal hecho constituía un quebrantamiento de los deberes del cargo, que imponía responsabilidad bajo los términos de una fianza que garantizaba el fiel y honesto cumplimiento de sus obligaciones. Aunque resueltos bajo fianzas que no se referían específicamente a la deshonestidad de empleados, véanse, *Shaw* v. *Cone*, 56 S.W.2d 667 (Texas 1933) ; *Austin* v. *Neiman*, 14 S.W.2d 794 (Texas

1929); *American Surety* v. *Austin,* 5 S.W.2d 626 (Texas 1928), y especialmente, *National Surety Co.* v. *First State Bank,* 244 S.W. 217 (Texas 1922), en donde se resuelve que cuando unos empleados y unos oficiales subalternos de un banco no sólo tenían conocimiento de las distracciones de fondos realizadas por un vice presidente, sino que además le ayudaban al ocultar lo que sabían figurando entradas falsas en los libros, tal conducta constituye un mal uso deliberado de fondos (*willful misapplication*), aunque propiamente no era una malversación o apropiación.

■ Establecida la responsabilidad de la compañía recurrida por las actuaciones del empleado F. . . B. . ., réstanos examinar la prueba presentada para determinar el monto de la pérdida que puede atribuirse a actuaciones de éste. En la demanda se reclamó la suma de $19,401.18. En el acto de la conferencia preliminar al juicio todo cuanto se aceptó fue que la pérdida sufrida ascendió a dicha cantidad, de forma que correspondía a la parte demandante establecer que la misma se debió a las actuaciones de I. . . C. . . y F. . . B. . ., para lo cual entre otras cosas, se ofreció un informe preparado por la firma de contadores Pol, Toro & Co. que incluía una relación de las cantidades apropiadas durante el período comprendido entre el 30 de junio de 1957 y el 30 de junio de 1959 especificando la fecha en que tuvo lugar cada apropiación, y por otros conceptos. De estos últimos conceptos parece claro que no están cubiertos por la fianza y por tanto procede eliminar las siguientes partidas: préstamo al señor C. . ., $29.85 y cargado en cuenta personal del empleado C. . ., $101.06.(⁴) La reclamación queda reducida a $19,270.27.

Ahora bien, la prueba establece fuera de toda duda que F. . . B. . . dejó de prestar servicios a Raval, Inc. durante la primera semana del mes de julio de 1958. No puede pues

---

(⁴) Así se admitió por el representante de la recurrente en el acto de la vista a preguntas del Tribunal.

responsabilizársele por las apropiaciones hechas por C. . . a partir de dicha fecha que ascienden a $9,558.65.([4]) Por otro lado, conforme a la prueba presentada, la primera apropiación que dio margen a una pérdida en la cual B. . . tuvo la intervención a que se ha hecho referencia tuvo lugar el día 22 de enero de 1958.([5]) No disponemos de evidencia competente para concluir que B. . . coadyuvó pasivamente en las apropiaciones anteriores a dicha fecha que ascienden a $2,499.83. Igualmente a pesar de que se presentaron las hojas de depósito correspondientes al 31 de enero de 1958 tampoco se comprobó la apropiación de la partida de $77.50 de la cliente Zoraida Rivera. En resumen, la responsabilidad de la compañía por los actos de B. . . sólo alcanza a $7,144.29.

## III

El segundo error se refiere a la omisión del tribunal a quo de incluir un pronunciamiento sobre el pago de intereses. En 5 de abril de 1960 el contador Manuel Toro Aquiles, a nombre de la recurrente, dirigió una comunicación a la recurrida incluyéndole una relación de las cantidades distraídas ascendentes a $19,401.18, que luego sirvió de base para la formulación de la demanda. El día siguiente la compañía aseguradora aceptó responsabilidad por los actos del empleado I. . . C. . . ofreciendo pagar la suma de $10,000. Al alegar contra la demanda presentada se adoptó igual posición pero no fue hasta el 28 de agosto de 1961, después que se había dictado sentencia, que se consignó la suma indicada.

Aun cuando hay autoridades para sostener que el punto de partida para que se incurra en la obligación del pago de intereses es la fecha en que ocurre el quebrantamiento que ocasiona la pérdida recobrable bajo la póliza de fidelidad, la regla que ha merecido mayor aceptación y que nos parece

---

([4]) Así se admitió por el representante de la recurrente en el acto de la vista a preguntas del Tribunal.

([5]) Partida de $457.50 del cliente Justino Reyes.

más razonable fija dicho comienzo a partir de la fecha en que se notifica a la compañía fiadora de la ocurrencia de la pérdida o se le exige el cumplimiento de su obligación de responder, *Prior Luke State Bank* v. *National Surety Corp.*, 80 N.W.2d 612 (Minn. 1957), trátese de seguro que garantizan la probidad de personas que ocupan tanto puestos públicos como privados de confianza. *American Casualty Co.* v. *Texas Real Estate Com'n*, 362 S.W.2d 192 (Texas 1962); *Employers Liability Assurance Corp. Ltd.* v. *Lewis*, 115 S.E.2d 387 (Ga. 1960); *Keen* v. *Lewis*, 109 S.E.2d 764 (Ga. 1959); Anotación, *Time from which interest begins to run on fidelity or public officers bond*, 57 A.L.R.2d 1317 (1958). Procede por tanto modificar la sentencia para conceder intereses a la recurrente sobre la suma de $10,000 desde el 5 de abril de 1960 hasta el 28 de agosto de 1961, y sobre la suma de $7,144.29 desde el 5 de abril de 1960 hasta la fecha de su pago.

*Se dictará sentencia de conformidad.*

