Donald A. McCormick and Laura J. McCormick v. Commissioner. Donald A. McCormick and Edith S. McCormick v. Commissioner.
McCormick v. Commissioner
Docket Nos. 3641-66, 3642-66.
United States Tax Court
T.C. Memo 1969-261; 1969 Tax Ct. Memo LEXIS 28; 28 T.C.M. (CCH) 1337; T.C.M. (RIA) 69261; December 9, 1969, Filed Robert E. Hunter, for the petitioners. James E. Merritt the respondent and Nicholas *29 G. Stucky, for SIMPSON
Memorandum Findings of Fact and Opinion SIMPSON, Judge: The respondent determined deficiencies in the income taxes of the petitioners as follows: Petitioners
Docket No.
Year
Deficiency
Donald A. and Edith S. McCormick
3642-66
1959
$11,857.10
1960
8,882.22
Donald A. and Laura J. McCormick
3641-66
1961
4,405.55
The issue for decision in these cases is whether the petitioners are entitled to deduct losses incurred in connection with their maintenance and operation of two sailboats. Findings of Fact Some of the facts have been stipulated, and those facts are so found. The petitioners, Donald A. McCormick and Edith S. McCormick, filed, as husband and wife, their 1959 and 1960 joint Federal income tax returns with the district director of internal revenue in San Francisco, California. The petitioners, Donald A. McCormick and Laura J. McCormick, are and Laura J. McCormick, are husband and wife and filed their 1961 Federal income tax return with the district director of internal revenue in San Francisco, California. At the time the petitions were filed in these cases, Edith S. McCormick resided in Stockton, *30 California, and Donald A. McCormick and Laura J. McCormick resided in Pebble Beach, California. Donald A. McCormick will be referred to as the petitioner. Since 1941, the petitioner figured prominently as a principal in various business ventures. In 1941, he organized a company, which built vacuum and laboratory equipment. In 1945, he organized a company, which manufactured high-speed centrifuges. In 1950, he organized McCormick-Selph Associates (MSA) and served as its president until June 1962 and as one of its directors until sometime in 1964, when he sold his interest in MSA to Teledyne. In connection with this sale, the petitioner covenanted to the purchaser that he would not compete with it for a period of 3 years. In 1960, MSA's stock was offered to the public. MSA manufactured explosive ordnance, principally for Government defense agencies. In the period around 1960, it employed approximately 230 people and had 1338 a gross income of $1,500,000 per year. During 1964, the petitioner purchased a candle shop in Monterey and also engaged in the business of private home construction. In 1966, he organized McCormick Industries, which, like MSA, engaged in the manufacture and *31 sale of explosive ordnance. During the years 1958 through 1965, the petitioner reported, for Federal income tax purposes, income in the following amounts from salaries, dividends and other corporate distributions, interest, and stock sales: Year
Amount
1958
$ 62,897.63
1959
51,867.19
1960
103,397.45
1961
32,225.00
1962
70,919.88
1963
38,007.70
1964
109,204.00
1965
170,860.97
On April 21, 1961, the petitioner's net worth was approximately $520,000. In March 1959, the petitioner purchased the Bottoms Up, a 28-foot sailing sloop, for $9,851.22. After purchasing the yacht Tamarit for $40,000 in July 1960, the petitioner sold the Bottoms Up in September 1960. The Tamarit, which was approximately 70 feet long, was designed and built in 1929 by Rice Brothers of East Booth Bay, Maine, for a Spanish nobleman. It was constructed of fine woods, such as teak and mahogany. Accommodations on the Tamarit included the following: Two double cabins: main saloon with four berths, dining table, cabinets, fireplace, television set, radio, upholstered cushions, bookshelves, interior lamps, carpeting, mahogany panelled walls; bathroom with electric head, shower, and *32 wash basin; galley with four-burner range, hotwater heater, stainless steel double sink, 16 cubic foot icebox and electric ice machine, cupboards, and stowage space. The Tamarit had the appearance of a commodious sailing yacht and not of a work boat; it was the largest sailing vessel in Monterey harbor at the time it was berthed there and had been referred to as the "class of Monterey Bay." In 1955, the petitioner became convinced that the field of oceanography was potentially very profitable. He attempted to secure MSA's entry into this field, but by late 1960 or early 1961, he realized that a majority of the directors of MSA were opposed to extending its operations into oceanography, except in the most superficial way. In 1959, the petitioner determined to enter into oceanographic activities, and to this end, he had discussions with various customers of MSA to obtain an idea of the interest in such an area. The general reaction to his ideas was favorable, however, he obtained no commitments for business, except from certain employees of MSA who agreed to rent his boat for pleasure cruises. At the time of his purchase of the Bottoms Up, the petitioner felt that a substantial amount *33 of his revenue would be obtained from MSA which he thought could use the boat for testing underwater ordnance devices. He also hoped, during off times, to charter the vessel for pleasure cruises and use it for making surveys of harbors of refuge on the California coast from which he could prepare charts for public sale. A harbor of refuge is an area of safety where a boat can escape rough seas generated by a storm. Although information as to such harbors was available in some form, the petitioner felt that no adequate charts existed for the use of owners of small pleasure craft. Ultimately, the petitioner hoped to acquire several vessels, and in addition to conducting surveys from them, he felt he could charter them for long-term commercial leases to scientific expeditions, for which he would provide crews, shoreside facilities, and other services. Sometime in 1959, the petitioner established the business name of "Oceanography Unlimited." During that year, he made an effort to secure some form of dockside facility around the Monterey area to serve as a business office, but this effort was unsuccessful. The petitioner made one other unsuccessful attempt to find such a facility before *34 he finally rented an office and warehouse on Fisherman's Wharf in Monterey sometime late in 1961. The office was identified by a sign "Oceanography Unlimited," had a telephone, the number of which was listed under the same name, and was equipped with drafting equipment such as might be used in making nautical charts. In late 1959 or early 1960, the petitioner consulted an accountant concerning the types of books and records he would need for Oceanography Unlimited, and in the middle of 1961, he purchased printed stationery with the business name. Soon after his purchase of the Bottoms Up, it became apparent to the petitioner that the boat was not suitable for oceanographic work, since it did not provide a stable platform. 1339 After acquiring the Tamarit, the petitioner listed it for charter with several yacht brokers and told certain other persons that it was available for such purposes. He also made arrangements with a professional seaman to captain the Tamarit during its charters, and such seaman did in fact later act as captain of the Tamarit on several of its charter voyages. The petitioner equipped the Tamarit with various kinds of navigation instruments which would *35 be useful in making surveys of harbors of refuge. Until October 1, 1961, the Tamarit was berthed in Moss Landing. The facility there was not completely satisfactory to the petitioner, and at that time, he moved the vessel to Fisherman's Wharf in Monterey. The berth at Monterey, although preferable to Moss Landing, had the disadvantage of being in achannel subject to heavy surge conditions in certain types of weather. The surge, which appears to be a very strong current brought on by tidal changes, made it difficult to keep the Tamarit secured to its berth, and during such conditions, it was important that someone attend the Tamarit to assure that it did not break loose from its berth and cause damage to itself or other vessels. Sometime prior to 1962, the petitioner began to devote Tuesdays and Thursdays to the Tamarit, and in the middle of 1962, when he ceased to be president of MSA, he started to devote his entire time to the vessel. The Tamarit cost the petitioner at least $1,000 per month to maintain, even when it was tied up at its berth. After purchasing the Tamarit, the petitioner learned that it, like the Bottoms Up, was not suited to handle the needs of oceanographic *36 expeditions. During the period that the petitioner owned the Bottoms Up and the Tamarit, there was little demand in northern California for charters of pleasure boats. The petitioner sold the Tamarit in September 1964. Around this time, he expressed an interest in purchasing a large power boat which would be better constituted to handle the needs of oceanographic expeditions than was the Tamarit. However, ultimately, the petitioner purchased a small outboard motor boat. The petitioner spoke with various commercial fishermen concerning the preparation of his surveys of harbors of refuge, and the record establishes that he prepared 8 such surveys. His surveys consist of pencil markings on photographic enlargements of charts prepared by the United States Coast and Geodetic Survey. The petitioner was unaware of the costs of publishing a book of charts or surveys and did not publish or make any arrangements for the publication or distribution of his surveys. The person to whom the petitioner sold his surveys for $570 in 1964 prepared a skindivers' map, based in part on the surveys, and sold approximately 2,000 copies of such maps at prices ranging from 12 cents to 25 cents apiece. *37 The petitioner recognized that short-term commercial charters were not economically practicable for a ship as large as the Tamarit and sought to obtain long-term commercial leases under which the vessel would be used for scientific purposes. The only charter obtained by the petitioner of such nature was a charter of the Tamarit to the Board of Trustees of the Leland Stanford Junior University (Stanford) executed on June 25, 1962. The charter agreement with Stanford provided that Stanford was to use the vessel for scientific purposes; that the petitioner would keep the vessel in good order and provide fuel, crew, and food all at his own expense; that Stanford would pay the petitioner $100 per week for the term of the contract and additional compensation of $300 for each sailing and an amount not exceeding $4,000 per month based on the period of time of use; and that the charter agreement could be cancelled by either party on 30 days' notice. The petitioner hoped that Stanford would make extensive use of the Tamarit, but, as it developed, Stanford used the Tamarit on only 9 days during 1962 and the petitioner's gross receipts for such year under the charter agreement amounted to only *38 $4,081.66. Stanford cancelled the charter agreement on August 22, 1963. Aside from the Stanford charter, all the charters of the Bottoms Up and the Tamarit were short-term pleasure charters. The petitioner was a passenger on several of these pleasure charters. Except for the Stanford charter and one additional charter, all of the charters were either to MSA or its employees and associated persons. These charters were presumably all arranged by the petitioner. The petitioner rejected one charter proposal obtained by a yacht broker because it was too involved. The harbor master of Monterey Yacht Harbor, who initiated the petitioner's contact with Stanford, referred several other persons to the petitioner who were interested in chartering the Tamarit, but nothing came of such referrals. 1340 The uses of the Bottoms Up and the Tamarit that might be considered business uses may be divided into three categories: Chartering for pleasure purposes; chartering for scientific purposes; and use in making surveys of harbors of refuge along the California coast. Following is a table showing the days during the period March 1959 through September 1964 on which the petitioner's vessels were *39 used for such purposes: [1] *10 Bottoms Up
No. of daysboat ownedduring year
No. of days used for:
Pleasurecharters
Surveys
Oceano- graphiccharters
1959
a 300
25
6
0
1960
a 270
0
0
0 *10 Tamarit
No. of daysboat owneddur- ing year
No. of days used for
Pleasurecharters
Surveys
Oceano- graphiccharters
1960
158
4
0
0
1961
365
7
0
0
1962
365
0
9
0
1963
365
0
0
0
1964
a 270
0
0
0
For Federal income tax purposes, the petitioner repored the following gross receipts and expenses for the years 1959 through 1965 in connection with Oceanography Unlimited: Year
Gross Receipts
Expenses
1959
$ 675.00
$ 10,575.78
1960
1,200.00
20,759.20
1961
2,490.00
19,815.49
1962
4,081.66
18,737.51
1963
7,597.00
12,378.34
1964
0
3,338.81
1965
570.00
3,552.46
The petitioner's reported *40 gross receipts of $675 in 1959 were derived from charters to several of the petitioner's associates at MSA. His gross receipts of $1,200 in 1960 were derived from two charters to MSA or its employees. Gross receipts of $2,490 in 1961 were comprised of $640 from charters to MSA, $450 from a charter to a group of doctors, $800 proceeds from an insurance claim, and $600 of rent which the petitioner charged himself for his use of the Tamarit as a personal residence. Gross receipts of $4,081.66 for 1962 resulted from a charter to Stanford University which used the Tamarit for scientific research. [2] The evidence does not disclose the source of the gross receipts reported for 1963. Gross receipts of $570 in 1965 were derived from the sale of five or more surveys. The record does not indicate that the Bottoms Up was used by the petitioner as either a residence or for pleasure cruises. Following is a table showing the number of days during the period July 1960 through September 1964 on which *41 the Tamarit was used by the petitioner for purposes not directly connected with an income-producing activity: Year
days
Use
1960
8
Personal trips
3
Windjammer race
2
Cruise for members of California and Santa Cruz Yacht Clubs
1960
1
Sea Scout trip. These voyages appear to be civic undertakings by the petitioner for the purpose of introducing children to sail- ing.
1961
a 92
Petitioner and his family living aboard
2
Sea Scout trips
2
Tamarit participates as flagship in Miss California Pageant
1
Tamarit participates in Monterey Harbor Day ceremonies
1962
a 304
Petitioner and his family living aboard
2
Tamarit participates in Miss Cal- ifornia Pageant
2
Cruise to Begonia Festival
2
Cruise to accompany small boat race
1
Tamarit participates in Monterey Harbor Day ceremonies
1
Cruise with Monterey judges
1
Marriage ceremony aboard Ta- marit
1963
88
Personal trips
26
Petitioner and his family living aboard
1
Tamarit participates in Monterey Bay Yacht Racing Association race
1964
5
Personal trip 1341 The petitioner has been a member of the Elkhorn Yacht Club since *42 April 1959, of the Sausalito Yacht Club since December 1960, and of the Monterey Peninsula Yacht Club since November 1964. The petitioner made substantial use of the facilities of the Elkhorn Yacht Club, and in the years 1959, 1960, and 1961, incurred bills for the use of the bar at such club of $182.55, $389.25, and 211.35, respectively. The Yachting Yearbook of Northern California, an annual official publication of the Pacific Inter Club Yacht Association, listed the Bottoms Up under the Elkhorn Yacht Club Sailing Fleet in 1960 and listed the Tamarit under the Elkhorn Yacht Club Sailing Fleet during the years 1962 through 1964, and under the Sausalito Yacht Club Sailing Fleet during the years 1963 through 1964. The Tamarit was assigned yacht racing number 134 and listed in the "Sailing Yacht Register" in the Yachting Yearbook of Northern California, under the petitioner's ownership during the years 1961 through 1964. A measurement certificate, permitting the determination of a racing handicap, had been filed for the Tamarit prior to its purchase by the petitioner. In 1961, the petitioner filed an entry blank for the Tamarit with the Yacht Racing Association of San Francisco Bay. *43 The petitioner flew the burgee, or emblem, of the Elkhorn Yacht Club from the mast of the Tamarit. In late 1961 or early 1962, the petitioner was interviewed aboard the Tamarit by a free lance writer who, as a result of such interview, wrote an article, which appeared in the January 30, 1962, edition of Game and Gossip magazine. The article, which indicates that the interview upon which it was based occurred within 2 months after the Tamarit was moved from Moss Landing to Monterey, traces the history of the Tamarit and reports on its construction and equipment. No mention is made in the article that the Tamarit was used for business purposes. To the contrary, the article indicates that the petitioner and his family were boating enthusiasts who were using the Tamarit for personal purposes. The petitioner enrolled the Tamarit with the United States Coast Guard as a vessel to be used exclusively for pleasure purposes. Under such enrollment, a yacht may only be chartered for pleasure use on a "bare boat" basis which requires the owner to relinquish dominion and control over the vessel and forbids him to be aboard during the charter. A yacht enrolled for pleasure service cannot be used *44 in the business of engaging in oceanographic studies. Although the petitioner was generally aware of Coast Guard regulations with respect to enrolled vessels, he did not know that he could not be aboard the Tamarit during charters and could not use it in an oceanographic business. Prior to 1962, the petitioner commingled income and expenses from his boating activities with funds in his personal bank account. Although the petitioner reported income of Oceanography Unlimited of $7,597 in 1963 and $570 in 1965 on his Federal income tax returns, such income was not recorded in the general ledger he kept for Oceanography Unlimited. The petitioner's logs of Bottoms Up and Tamarit voyages were not kept methodically and do not report the precise time of charters or the use of the boats. Opinion The issue for decision is whether the petitioners are entitled to deduct the losses incurred by them in connection with the maintenance and operation of the Bottoms Up and the Tamarit during the years 1959 through 1961. In his determination, the respondent has allowed a deduction for such expenses to the extent of the income reported from the operation of the vessels so that our issue relates *45 only to the deductibility of the expenses that exceeded the income. Initially, we must pass on a motion by the petitioners to strike from the record of this proceeding the article which appeared in the January 30, 1962, issue of Game and Gossip magazine. During the first day of the trial of this case, the respondent called as his witness the author of the article, who identified the article as having been written by him on the basis of an interview with the petitioner and Laura J. McCormick aboard the Tamarit. The witness wrote the article within 2 weeks after the interview. The article was received in evidence over the petitioners' objection that it was not written until sometime after the interview. The petitioners do not now press that objection. However, the petitioners now contend that no proper foundation was laid for the admission of the article inasmuch as the witness did not testify as to the time of the interview. This objection was first made by the petitioners on the second day of the trial, 3 days after the article had been received in evidence and its author excused as a witness. Even if the date of the interview was a foundation fact necessary to the introduction of *46 the article, we think the petitioners' motion to 1342 strike the article from evidence must be denied. The article indicates that it was written approximately 2 months after the date on which the petitioner moved the Tamarit from Moss Landing to Fisherman's Wharf at Monterey. Since we know that such move occurred on October 1, 1961, and since we know that the interview occurred no more than 2 weeks prior to the writing of the article, we think that the date of the interview is adequately established by the record. In any event, the petitioners' motion to strike occurred well after the acceptance of the article into evidence and the excusing of the witness who could testify as to the date of the interview. The motion is therefore untimely. See Limbeck v. Interstate Power Co., 69 F. 2d 249 (C.A. 8, 1934); United States v. Aluminum Co. of America, 35 F. Supp. 820 (S.D.N.Y. 1940); G. E. Fuller, 20 T.C. 308 (1953), affd. 213 F. 2d 102(C.A. 10, 1954); McCormick, Evidence, sec. 52 (1954). The petitioners contend that the losses incurred by the petitioner in connection with his boats are deductible as losses incurred in a trade *47 or business. Sec. 162(a), 165(c)(1), Internal Revenue Code of 1954. [3] The respondent's position is that such losses were not incurred in a trade or business and are nondeductible personal expenses. Sec. 262. The petitioners have the burden of proving that the claimed losses were incurred in a trade or business, and in order to satisfy such burden, they must show that the petitioner's boating activities were undertaken with the bona fide intention and expectation of making a profit. Whether the petitioners have made such a showing is a factual question turning on the circumstances surrounding the alleged trade or business. Margit Sigray Bessenyey, 45 T.C. 261 (1965), affd. 379 F. 2d 252 (C.A. 2, 1967), cert. denied 389 U.S. 931 (1967); American Properties, Inc., 28 T.C. 1100 (1957), affd. per curiam 262 F. 2d 150 (C.A. 9, 1959); Henry P. White, 23 T.C. 90 (1954), affd. per curiam 227 F. 2d 779 (C.A. 6, 1955). See also sec. 1.162-12, Income Tax Regs. *48 ; Marcell N. Rand, 34 T.C. 1146 (1960). In the present case, the evidence adduced falls short of showing the requisite intent. The evidence does establish that the petitioner intended and expected to derive some gross receipts from the operation of his boats. He did rent an office, establish a set of books and records, and secure business stationery; he spread the word among business acquaintances, harbor masters, and yacht brokers that his boats were available for charter, and he secured some charters - mostly short-term charters for pleasure, but also one long-term charter that might have been productive of substantial income; and he did prepare and sell some surveys. Nevertheless, such evidence does not convince us that he intended or expected to make a profit from such activities. The petitioner was an experienced and successful businessman at the time he purchased the Bottoms Up and the Tamarit. Consequently, his activities cannot be justified or explained on the basis of lack of business experience or naivete. Yet, from an examination of the entire record, it appears to us that the petitioner's *49 oceanography activities were conducted in a casual manner - there is lacking any evidence that such activities were pursued in the systematic and energetic method which we would expect of a man such as the petitioner. The petitioner made substantial capital outlays for the Bottoms Up and the Tamarit without obtaining in advance any assurance that they would produce substantial revenue. Had he made any serious investigation as to his prospects of success, he would have learned that the charter market in northern California was a weak one and that his vessels were both inappropriate for oceanographic expeditions and expensive to maintain. Although books and records were established for Oceanography Unlimited, they were not maintained with even reasonable consistency, and they were not complete. The petitioner claims that when he enrolled the Tamarit as a pleasure vessel, he did not realize the limitations on the use of a vessel so enrolled, but it seems that an experienced businessman should have made sufficient inquiry to determine how the ship should have been enrolled so that it could legally be used for business purposes. From a business viewpoint, his boating activities were *50 disastrous from start to end. In each year for which we have evidence, the petitioner suffered heavy losses in 1343 connection with his boats. He owned the Bottoms Up for approximately 570 days, but it was only used on 31 days for purposes which could arguably be considered business connected; he owned the Tamarit for approximately 1,523 days, but used it on only 20 days for such purposes. With a single exception, all of the charters he obtained were commercially undesirable since they were for short periods of time. The petitioner testified that he expected to realize gross receipts of approximately $60,000 a year from the Stanford charter, the one long-term charter that he secured, but it is difficult to see how such charter could have been so productive. The petitioner's surveying activities were, if anything, even more unsuccessful than his chartering activities. He equipped his office and the Tamarit with surveying and cartographic equipment, yet he made very few surveys and derived only $570 gross receipts from such activities. He never inquired about the feasibility of publishing his surveys, although it seems that an experienced and successful businessman would have made *51 such inquiries if he expected to derive a profit from the surveys. The evidence as to when the surveys occurred was so confusing and contradictory that we were unable to make findings of fact with respect to most of them, but such evidence does indicate that they occurred spasmodically - there is lacking any evidence of an organized plan to make surveys for commercial purposes. On the basis of the evidence presented to us, the surveying activity appears more like a hobby than a business earnestly pursued for profit. At one point in his testimony, the petitioner stated that he started devoting Tuesdays and Thursdays to the business of Oceanography Unlimited in 1959; at another point, he testified that it was not until 1961 that he devoted 2 weekdays to the business. He also testified that in 1962 he began devoting his entire time to the business. It is inconceivable to us that the petitioner, in view of his knowledge and experience, could have devoted that much time to a business and have so little to show for it. The record shows that all but two of the charters of the Bottoms Up and the Tamarit were arranged by the petitioner through his offices at MSA; contacts for the other charters *52 were made through third persons and should not have required much of the petitioner's time; his surveying activities were negligible; and no serious effort seems to have gone into promoting the business of Oceanography Unlimited. On the other hand, the record indicates that the petitioner made substantial use of the Tamarit for personal purposes. He used the vessel to take numerous pleasure cruises, some of an extended duration, and to participate in various social and civic activities. He also was a passenger on several of the chartered cruises, and the evidence indicates his participation in such cruises was not connected with the alleged business of Oceanography Unlimited. Additionally, he and his family used the Tamarit as a personal residence for a period of over a year. The petitioners argue that participation in yacht races and civic activities were business motivated, since such participation yielded favorable publicity helpful in the business. However, in our Findings of Fact, we have treated such activities as personal, and not for business purposes. In the publicity of these activities that was made a part of the record in this case, there is no indication that the petitioner *53 was in the oceanography business or that the Tamarit was available for chartering. It seems that if he had engaged in such activities to further the business, he could and would have arranged to have some of the publicity include the fact that the ship was available for chartering. We cannot see how the news coverage that has been presented to us could significantly further his business purposes. It is suggested that the petitioner was forced to live aboard the Tamarit for a 13-month period from October 1961 through October 1962 in order to protect the vessel from the surge conditions existing at Fisherman's Wharf. Apparently, the petitioners wish us to conclude that they lived aboard the ship to protect it and to further the oceanography business. However, the record shows that the petitioner charged himself rent for his use of the Tamarit as a personal residence. This charge is inconsistent with the contention that living aboard was required for business reasons. Additionally, the petitioner lived aboard the Tamarit during periods when surge was not a problem and attendance of the vessel was not required. Finally, the petitioner's family lived on the Tamarit with him, and the evidence *54 indicates that this style of life was in accordance with his personal desires for comfort and happiness. He entertained on the boat and seems to have 1344 preferred living there to his shoreside home. For these reasons, we think the petitioner's extended residence aboard the Tamarit is not reconcilable with the contention that he lived aboard for business reasons. After considering the entire record, we have concluded that the petitioner has failed to prove that the respondent's determination is erroneous. During the years in issue, the petitioner was a man of considerable income and wealth who could afford to indulge his taste for boating. His personal use of the Tamarit was extensive, and his business use of both of his vessels was sparse. The evidence does not support a conclusion that the petitioner seriously undertook Oceanography Unlimited as a profitmaking venture, and accordingly, the losses sustained by the petitioner are not deductible under either section 162(a) or 165(c)(1). The petitioners do not argue for, and the evidence does not support, an allocation of the losses of Oceanography Unlimited to pleasure and business purposes. Cf. Challenge Manufacturing Co., 37 T.C. 650 (1962). *55 In order to reflect the agreement of the parties as to other adjustments, Decisions will be entered under Rule 50. Footnotes
1. There was some evidence at trial indicating that the vessels were used for charters and surveys not included in this list. However, such evidence was so confused and contradictory that we are unable to make findings with respect to such activities.↩
a. Approximate figure.↩
2. Although not repored on his Federal income tax return, the books of Oceanography Unlimited reflect rental income of $2,000 from the petitioner for his use of the Tamarit as a residence in 1962.↩
a. Approximate figure.↩
3. All statutory references are to the Internal Revenue Code of 1954.↩